IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES, )
)
Plaintiff, ) No. 03 CR 271
)
vs. ) Judge James B. Zagel
)
FRANCOIS COTE, )
)
Defendant. )

## NOTICE OF FILING

**F I L E D**

FEB 18 2005 **NFi**

FEB 18 2005
**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

TO:   AUSA Patrick McGovern
U. S. Attorney's Office
219 South Dearborn Street, 5th floor
Chicago, IL 60604

Please take notice that on February 18, 2005, I caused to be filed in the United States District Court for the Northern District of Illinois, Eastern Division, the attached **MOTION TO DISMISS**, a copy of each of which are hereby served upon you.

_____
Attorney for Defendant

John M. Beal
Attorney at Law
53 W. Jackson Blvd., Suite 1108
Chicago, IL 60604
(312) 408-2766

## CERTIFICATE OF SERVICE

I, John M. Beal, attorney, state that I caused a copies of **MOTION TO DISMISS** and Notice of Filing to be served upon the individual(s) listed above by personal service on February 18, 2005. I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 18, 2005

_____
John M. Beal

FILED

FEB 1 8 2005  NH

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | No. 03 CR 271 |
| | ) | |
| vs. | ) | Judge James B. Zagel |
| | ) | |
| FRANCOIS COTE, | ) | |
| | ) | |
| Defendant. | ) | |

FILED

FEB 1 8 2005  NF,

FEB 18 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## MOTION TO DISMISS

NOW COMES the defendant Francoise Cote, by his attorney John M. Beal, and respectfully moves this Court to dismiss the indictment in this case or, in the alternative, to hold a hearing on this motion, and in support thereof states as follows:

## INTRODUCTION

1. Defendant Cote has been charged in this case with violating 18 U.S.C. §2423(b), for allegedly traveling in interstate commerce from Nassau County, New York to Chicago, Illinois, "with the intent and for the purpose of engaging in a sexual act...with 'Lil Mary,' whom defendant believed to be a female minor who had not attained the age of 16, and who, unbeknownst to defendant, was in fact an undercover law enforcement agent...." Indictment attached as Exhibit 1. Defendant Cote submits, first, that the charge contained in this indictment fails to state an offense that meets Constitutional muster and, second, that the government has investigated and charged this case in a manner that contravenes

defendant Cote's Constitutional rights of free speech, intimate association, privacy and travel.

**FACTS OF CASE**

2. Based upon the FBI 302s and Cook County Sheriff's Police Department case reports, the following facts of the case appear to be essentially uncontested. On January 27, 2003, defendant Cote was in an Internet chat room named #0!!!!!!!!!!!younggirlsex. He was using the nickname Tenderkni, which was all the letters of his full screen name, Tenderknight, that would fit in the screen of that chat room. Also in the chat room was Cook County Sheriff's Police Detective Mary Perovich, who was assigned to the Child Exploitation Unit, and who was using a computer in that unit's office. She was using the screen name Lil Mary.

3. Mr. Cote was not seeking to conceal his identity. Material provided by the government in discovery shows that "Tenderknight" linked back to Mr. Cote's Yahoo e-mail, where his profile contained his accurate name, location, occupation, etc. Mr. Cote's Yahoo profile is attached as Exhibit 2.

4. The #0!!!!!!!!!!!younggirlsex chat room stated at the time of this case when a party entered it, "Fantasy channel for young girls and those who love them." Printout attached as Exhibit 3.

5. Mr. Cote sent a request to Detective Perovich to engage in a private chat. The initial interchange between Mr. Cote ("Tenderkni") and Detective Perovich (using the screen name "lilmary") began as follows:

2

```
<Tenderkni>  hey there...43/M/NY here ;- want to talk?
<lilmary> sure 14 f chgo
<Tenderkni> you like older men?
<lilmary> sure
<Tenderkni> have you had sex?
<lilmary> no not yet
<Tenderkni> you think about it?
<lilmary> yes
<Tenderkni> I'm very excited that you are 14 and a virgin :)
<lilmary> really?
<Tenderkni> yes, very much
<lilmary> y?
<Tenderkni> because it's very exciting to be your first...to hear you and see
           as you receive so much pleasure for the first time.
<lilmary> oh I didnt know
<Tenderkni> does that appeal to you?
<lilmary> sure
<Tenderkni> really...you might be interested in meeting in person?
<lilmary> yeah - pics arent always who u r
```

Then, a few minutes later, they agree that he will travel to Chicago on February 14 to meet her. Initial page of transcript attached as Exhibit 4.

6. Following the foregoing session, Mr. Cote and Detective Perovich exchanged photographs, although Mr. Cote's was authentic and Detective Perovich's was not.

7. This initial interchange on January 27 was followed by more chat room interchanges, and by e-mail exchanges and telephone conversations through March 11. During these communications Mr. Cote disclosed much accurate information about himself. On February 13, 2003, the Sheriff's Police contacted the FBI, and the FBI became involved in the case. Mr. Cote canceled the trip on the day it was originally scheduled to take place. During the additional communications, Mr. Cote rescheduled his trip for March 12. On March 12, Mr.

3

Cote traveled to Chicago  and was arrested.

8.   More specifically, on March 12, 2003, Mr. Cote traveled from New York to Midway Airport in Chicago.   Upon arrival, he went by taxicab to a Wendy's Restaurant in Oak Park, Illinois.  The Sheriff's Department case reports states,

> At approximately 1303 hours, the suspect, now known as Francois Cote, entered the Wendy's Restaurant and approached the U/C officer, deputy Tiffany Russ.  Deputy Russ was acting in the U/C capacity of 14 year old "Mary."  When Cote approached the U/C officer, he asked, "Are you Mary?" Deputy Russ replied, "Yes" and then stood up.  Deputy Russ was hugged by Cote.  Cote was then taken into custody at that time.
> Case Report attached as Exhibit 5.

9.  Deputy Russ was, in fact, an adult Cook County Sheriff's Police Department Officer.  Mr. Cote was then taken to the Cook County Sheriff Police Department police station, where he was questioned from approximately 1:20 p.m. to 7:45 p.m. He was held overnight at that station.  The next morning he was taken to the FBI office at 219 South Dearborn Street, Chicago, and had his initial court appearance the following day (March 14).

10. Mr. Cote told FBI that he had previously met several adult women, first on the Internet and then in person.  He has never met a minor in person after first meeting on the Internet.  FBI 302 attached as Exhibit 6.

11.  Mr. Cote has no prior criminal convictions.

### BACKGROUND

12. In order to address in a meaningful way the issues presented by this case, it is necessary to set forth the nature of the IRC chat rooms from which this case

emanated and also how the Internet has become a major vehicle for social interaction in the United States. This has significant consequences for the nature of law enforcement activity that is, or should be, permitted in this setting. The argument section addresses the extent to which it is appropriate for the court to consider facts external to the indictment in a motion to dismiss in a case in which the charged conduct also enjoys constitutional protection.

13. This case arose from communication between Mr. Cote and an undercover officer in a chat room on the Internet. A description of the Internet, generally, and chat rooms, in particular, follows.

14. The Supreme Court described the Internet as follows in *Reno v. American Civil Liberties Union, et al.*, 521 U.S. 844, 849-852, 117 S.Ct. 2329 (1997), although the numbers of users and sites have grown significantly since 1997:

> The Internet is an international network of interconnected computers. It is the outgrowth of what began in 1969 as a **\*850** military program called "ARPANET," [FN3] which was designed to enable computers operated by the military, defense contractors, and universities conducting defense-related research to communicate with one another by redundant channels even if some portions of the network were damaged in a war. While the ARPANET no longer exists, it provided an example for the development of a number of civilian networks that, eventually linking with each other, now enable tens of millions of people to communicate with one another and to access vast amounts of information from around the world. The Internet is "a unique and wholly new medium of worldwide human communication." [FN4]
> FN3. An acronym for the network developed by the Advanced Research Project Agency.
> FN4. *Id.*, at 844 (finding 81)(citing to the district court case, 929 F.Supp. 824, E.D.Pa.1996).
>
> The Internet has experienced "extraordinary growth." [FN5] The number of "host" computers –– those that store information and relay communications

-- increased from about 300 in 1981 to approximately 9,400,000 by the time of the trial in 1996. Roughly 60% of these hosts are located in the United States. About 40 million people used the Internet at the time of trial, a number that is expected to mushroom to 200 million by 1999.
FN5. *Id.,* at 831 (finding 3).

Individuals can obtain access to the Internet from many different sources, generally hosts themselves or entities with a host affiliation. Most colleges and universities provide access for their students and faculty; many corporations provide their employees with access through an office network; many communities and local libraries provide free access; and an increasing number of storefront "computer coffee shops" provide access for a small hourly fee. Several major national "online services" such as America Online, CompuServe, the Microsoft Network, and Prodigy offer access to their own extensive proprietary networks as well as a link to the much larger resources of the Internet. These commercial **\*851** online services had almost 12 million individual subscribers at the time of trial.

Anyone with access to the Internet may take advantage of a wide variety of communication and information retrieval methods. These methods are constantly evolving and difficult to categorize precisely. But, as presently constituted, those most relevant to this case are electronic mail (e-mail), automatic mailing list services ("mail exploders," sometimes referred to as "listservs"), "newsgroups," "chat rooms," and the "World Wide Web." All of these methods can be used to transmit text; most can transmit sound, pictures, and moving video images. Taken together, these tools constitute a unique medium--**\*\*2335** known to its users as "cyberspace"--located in no particular geographical location but available to anyone, anywhere in the world, with access to the Internet.

E-mail enables an individual to send an electronic message--generally akin to a note or letter--to another individual or to a group of addressees. The message is generally stored electronically, sometimes waiting for the recipient to check her "mailbox" and sometimes making its receipt known through some type of prompt. A mail exploder is a sort of e-mail group. Subscribers can send messages to a common e-mail address, which then forwards the message to the group's other subscribers. Newsgroups also serve groups of regular participants, but these postings may be read by others as well. There are thousands of such groups, each serving to foster an exchange of information or opinion on a particular topic running the gamut from, say, the music of Wagner to Balkan politics to AIDS prevention to the Chicago Bulls. About 100,000 new messages are posted every day.

In most newsgroups, postings are automatically purged at regular intervals. In addition to posting a message that can be read later, two or more individuals wishing to communicate more immediately can enter a chat room to engage in real-time dialogue -- in other words, by typing messages to one another that appear almost immediately on *852 the others' computer screens. The District Court found that at any given time "tens of thousands of users are engaging in conversations on a huge range of subjects." [FN6] It is "no exaggeration to conclude that the content on the Internet is as diverse as human thought." [FN7]

FN6. *Id.*, at 835 (finding 27).

FN7. *Id.*, at 842 (finding 74).

15. Other cases describing the Internet include ACLU v. Reno, 929 F.Supp. 824, 830-845 (E.D. Pa. 1996); and *American Libraries Assoc. v. Patacki*, 969 F.Supp. 160, 164-167 (S.D.N.Y. 1997). The Internet continues to evolve as a means of communication, for example for transmitting large video and audio files via broad band, for wireless Internet communication, and for Internet telephone communication.

16. The Internet itself has received substantial attention in the caselaw. However, Internet Relay Chat rooms, where this case originated, have received less. In fact, in most cases concerning §2423(b) the exploration of the nature of IRC chat rooms has been perfunctory, leading to an unsatisfactory analysis of the constitutional and other legal consequences.

17. This case arose consequent to Defendant Cote's speech, or, more precisely, role playing, in an adult Internet chat room. Specifically, Mr. Cote met the undercover law enforcement officer referred to in the indictment in an adult fantasy chat room. The chat room is named #0!!!!!!!!!!!!younggirlsex and is operated by the

Undernet IRC network, described more fully below.

18. IRC stands for Internet Relay Chat. The world of IRC is an international community of hundreds of thousands of people talking via text to each other in a multitude of chat rooms organized around a multitude of topics. The structure of IRC can be described as follows. It consists of networks of computers. The largest networks each have over 100 servers located all around the world. All of the servers on a given network are connected together. The networks are not connected with each other. Each network, in turn, hosts many chat rooms, called channels. The largest networks have up to 50,000 channels, although not all are active at any given time. Individual participants, or users, install software that enables them to access chat rooms. The IRC software is called an IRC client. A user sets up his or her IRC identity on their software. He or she then can utilize any IRC network by signing onto a channel of that network. See, http://www.irchelp.org/irchelp/rfc. [1]

19. The larger networks often have well over 100,000 users online at one time.

---

[1] A Miami University of Ohio website describes the history of IRC: "IRC is one of the largest users of bandwidth on the Internet. Invented in 1988 by Jarkko Oikarinen,....Originally used at the University of Oulu, in Finland, Oikarinen used the program to replace Unix Talk, which did not allow more than two people in a conversation at once. The program became immensely popular at the University, and eventually spread throughout Scandinavia. By the end of 1988, IRC was spreading throughout the Internet."
www.muohio.edu/psybersite/cyberspace/addiction/irc.shtml

Among the largest networks are QuakeNet, Undernet, IRCnet, DALnet, and EFnet.

For example, DALnet's website states,

> In December 2000, DALnet the first to hold over 80,000 concurrent chat clients, making it the largest IRC Network in the world. Today, the network handles over 2 million daily connections and supports a userbase of more than 500,000 registered users. Staffed by nearly 200 volunteers and receiving no revenue, the network relies on the generosity of its supporting ISPs to provide the bandwidth it uses.
>
> DAL.net printout attached as Exhibit Seven.

An IRC monitoring cite gave the following statistics for the four largest IRC networks, as well as hundreds of smaller networks, on October 19, 2004:

| Network | Users | Channels | Servers |
| --- | --- | --- | --- |
| QuakeNet | 219,786 | 195,914 | 41 |
| Undernet | 132,434 | 50,409 | 37 |
| IRCnet | 124,505 | 58,928 | 46 |
| EFnet | 111,056 | 42,908 | 52 |

Printout attached as Exhibit 8.

20. The channels, or chat rooms, are maintained by unpaid volunteers, called IRC ops. They keep the channels functioning on the severs. There are also channel operators, or Chan ops. They monitor chat rooms and can expel users from a channel who do not follow the rules, such as users who attempt to utilize a channel for commercial purposes. However, as Undernet's IRC channel introduction states, "Undernet is an unmoderated, world-wide medium. Undernet does not censor what kind of channels can exist...If warez, porn, or any other type

9

of channels are offensive to you, don't go there...."

21. In this case, both Mr. Cote and the undercover officer entered the same IRC chat room utilizing software named mIRC. The mIRC software is software known as shareware, for which users are expected to pay $20 after a 30 day trial period. Both had registered on their software and adopted a nickname in order to access chat rooms. See, www.mIRC.com. Both parties thereby accessed the chatroom named #0!!!!!!!!!!!younggirlsex on the Undernet network. As noted above, networks have multiple servers, and when a party signs onto a network's chat room (or channel) that party is automatically connected to one of the network's servers. For example, when counsel twice accessed the Undernet network on July 3, 2004, he was first directed to a server in Geneva, Switzerland, and the second time to a server in Amsterdam.

22. When counsel signed onto the Geneva server, he was connected to eu.undernet.org. The server welcome page, which also emanates from Geneva, Switzerland, stated "type /MOTD to read the AUP before continuing to use this service." Typing in /MOTD produced a page that stated (with grammar uncorrected):

> Our Rules:
>     - The direct or indirect use of this server for illegal activities such as warez child pron, mp3 is STRICTLY PROHIBITED!
>     - You may run one friendly visible bot as long as it does not attract attention to itself. (Any complain about a bot may result in an immediate k-line).

23. On September 13, 2004, Undernet's website (www.undernet.org.)disclosed that

10

it was operating on 28 servers, 20 in Europe, seven in the United States, and one in Panama. The Undernet web site explains that the network is entirely a volunteer operation. It is run by several committees that: 1) handle coding the network's software, 2) handling routing, 3) oversee the channels, and 4) deal with users. The committees presently consist of approximately 132 individuals from over 26 countries, including the United States (and Puerto Rico), Canada, Mexico, Dominican Republic, Brasil, United Kingdom, New Zealand, Australia, Netherlands, France, Belgium, Austria, Italy, Switzerland, Spain, Portugal, Malaysia, Turkey, Sweden, Romania, Hungary, France, Norway, Morocco, Lebanon, and Israel. On July 3, 2004, Undernet had 17,613 active chat rooms in its system, with chat being conducted in a multitude of languages.

24. Counsel joined the Undernet #0!!!!!!!!!!!younggirlsex chat room.[2] That chat room opened with the notice:

> * Now talking in #0!!!!!!!!!!!younggirlsex
> * Topic is 'No &%%$@#!! topics allowed. .This is NOT a trading or pedo channel(.) No annoying repeat ads. Remember ignore works.'
> Printout attached as Exhibit 9.

25. As noted earlier, at the time of the events of this case in 2003, the opening notice was: "Fantasy channel for young girls and those who love them." Exhibit Three. The nature of the chat room has not changed to the present time.

26. The chat room operates as follows. Participants type in messages that appear

---

[2] Defense investigation has indicated that the server on which the #0!!!!!!!!!!!younggirlsex channel resides is in Sweden.

11

on the screen, which continually scrolls upward. A ping sound is made every time an entry appears. The nicknames of the persons who are in the chat room at a particular time appear on the right hand side of the screen, with the chat room volunteer monitors located at the top of the list with @ signs before their names. And the participants can engage in private chats to which others in the chat room do not have access. That is done by one participant sending a message to another participant on the right hand list inviting them to take part in such a private chat.

27. The true nature of the #0!!!!!!!!!!!!younggirlsex chat room can first be gleaned from the nicknames of the participants and then by the nature of the chat messages. The following information comes from three half hour samples of chat that were printed out from the #0!!!!!!!!!!!!younggirlsex chat room, with half hour breaks, on June 25, 2004. The full transcripts are attached as Exhibit 10.

28. The nicknames of persons in the chat room in the first sample session include: Titfucker, Roughone, pantdad, bimalepig, FunOnCAM, CRIMINALGIRL, gooeygirl, ur4harem2, olderped, Son4Mom, wifie-32, swiftman, skeetsex, JstNTime, serialgirl, WellHung, UncleJack, coachynggrls, Crafty32, PhoneDom, Horney_me, Longcock, feelngood, and babyangel. In addition, there are participants with ordinary female first names, such as Kristine, Sally, Susann, HollyLee, Brooke, Isabel, and Camille. However, the one channel operator for the #0!!!!!!!!!!!!younggirlsex chat room from whom counsel was able to elicit an e-mail response stated that most of the "girls" are actually men playing young girls. Response attached as Exhibit 11.

12

29. With respect to the chat itself, there are several obvious attributes. First, on the second and third pages of the first session, two different monitors are banning participants for rule violations. Second, the nature of the sexual messages is often blatant and direct. For example, "hi, any girl wanna see my cock?" (session 1, page 1); "are there any parents here who encourage their daughter to dress or act like a slut?" (Session 2, p. 2); and "manwebcam is now known as man5inchcock" (session 2, page 3). Similarly, multiple "male" participants message with "ashleyD" as follows:

<Rob38> for gods sake, no one ask her how its hanging, we'll be here all night.
\*      \*      \*
<Ehrlichiosis> well, for her it would be 'how are they hanging' no?
<RangerJoe> depends on if she is over 11, I suppose.
<ashleyD> who is hanging?
<RangerJoe> she seems pretty smart for an 11 year old tho.
<RangerJoe> perhaps she plays one.
<Rob38> I wish I was as smart as an 11 year old
<RangerJoe> me too
        Session 3, p. 1

<DrDogma> so ashley...
<ashleyD> yes?
<DrDogma> I guess a/s/1 is out of the question?
<ashleyD> depends on what is your goal
\*      \*      \*
<DrDogma> RangerJoe wanted me to ask
<ashleyD> of you are his puppy
<DrDogma> my goal is not to die from friendly fire
<DrDogma> puppy...attorney...pretty much the same
<julie18> any big black cock for me?
<DrDogma> his best friend
<ashleyD> julie18, why? You are not fine with being a woman?
<DrDogma> here white one clashes with the shoes
        Session 3, pages 4-5.

13

30. There are also numerous messages asking chat rooms participants to role play:

* Driven is m/34 seeking girls into roleplay..please message me, thanks.
Session 1, page 4.
<Zarix> any young and naughty schoolgirl would like to roleplay? Msg me
      Session 1, page 6.

* bimalepig is submissive older guy seeking hot kinky roleplay - maybe more - message me please
      Session 2, page 4.

<minnie> is there anyone that wants to chat with a 16/f-bi/sub?
<ashleyD> minnie, honestly, no one wants to chat with you
<DrDogma> and there is certainly no one who will want to chat with a dead 16-f/bi/sub old maid
      Session 3, page 4.

<normand42> man42yr want chat with very young gir
<DrDogma> that doesnt narrow it down a bit does it
<ashleyD> normad42, your chances are slim
      Session 3, page 7.

31. Defendant Cote is prepared to attest that his experience is that participants who overtly state that they want to role play, as opposed those who directly play a role from the outset, get few, if any, responses. They have begun by breaking their cover and have thereby shown that they are too lame to be worth role playing with.

32. As one district court recognized,

> Role playing and adopting assumed identities is common in on-line communities. See, e.g., Dorian Sagan, *Sex, Lies, and Cyberspace*, Wired, Jan. 1995, at 78 (discussing the multiple, and differently gendered, identities assumed by the author on the commercial service America Online – and subtitled, "Online, no one knows you're a dog. Or male. Or a 13 year old girl.")
> *United States v. Baker*, 890 F.Supp. 1375, 1386, Fn. 17.

14

And role playing is not limited on the Internet to IRC chat rooms. In February of this year the New York Times reported that Amazon.com's "Canadian site had suddenly revealed the identities of thousands of people who had anonymously posted book reviews on the United States site under signatures like 'a reader from New York.'" Some of the "anonymous" reviews were by established authors such a Jonathan Franzen and David Eggars trashing their competitors. A. Harmon, *Amazon Glitch Unmasks War of Reviewers,* The New York Times, Feb. 14, 2004.

33. Moreover, there are a number of different types of fantasy sites on IRC networks. One is the role playing kind typified by #0!!!!!!!!!!!younggirlsex. On the Undernet network, there are the following similar channels: #0!!!!!!!!ltlgirlsex, #0!!!!!!!!!!pedomoms, #0!!!!!!!!Childslavesex (which describes itself as "Undernet's Premier Fantasy Child BDSM Channel"), #0!!!!!!!!!!!girlswhosuckcock, #bondage, and #rapesex, Many of the same channel monitors appear on the monitor listings for all of these channels.

34. Another type of role playing channel is the channels on which participants play roles in Internet games, the most popular of which is DarkMyst. One IRC search engine found 546 sites on which participants play roles in DarkMyst. Printout attached as Exhibit 12.

35. More importantly, the activity in fantasy chat rooms such as the #0!!!!!!!!!!!younggirlsex contrasts sharply with that which occurs in genuine teen chat rooms, of which there are many in IRC networks. For example, the following

15

is a sample from Undernet network's Teenworld on July 2, 2004:

\* checker2000 was kicked by Elise/AWAY (I told you not to msg me!  Buh bye hope never to see you again)
      \*    \*    \*
&lt;tigerEvIL&gt; lol
&lt;PsychoChick&gt; what are you lolling at?
&lt;tigerEvIL&gt; at topic
&lt;tigerEvIL&gt; hanna is mi friend
&lt;tigerEvIL&gt; do you know hanna banana
      \*    \*    \*
&lt;PsychoChick&gt; maybe
\* GHOST_MAN has joined #TeenWorld
\* X sets mode: +b \*!\*xxx@80.97.208\*
\* GHOST_MAN kicked by X ((Cuties16m) well if you're so GIFTED lets see ya get back in Here :))
&lt;BANKSY&gt; yo Psychochick
\* Christy has quit IRC (Quit)
&lt;PsychoChick&gt; hi BANKSY
Transcript attached as Exhibit 13.

36.  The contrast between the chat in the #TeenWorld and #0!!!!!!!!!!!younggirlsex is so striking and apparent that any reasonable person would readily understand what was transpiring in each from both the screen names and the chat itself.  It is clear that #0!!!!!!!!!!!younggirlsex is not intended for real teenagers, nor do there appear to be any real teenagers in that chat room.  In short, the participants are behaving like adults.  On the other hand, the screen names and chat in the #TeenWorld chat room is self-evidently that of actual teenagers.

37.  In connection with all of the role playing and chat room activities, it has been repeatedly recognized in cases concerning the Internet that it is impossible to know the age of persons with whom one is communicating on the Internet, in or out of chat rooms.  "The (district) court found no effective way to determine the age of a

16

user who is accessing materials through e-mail, mail exploders, newgroups, or chat rooms...As a practical matter, the Court found it would be prohibitively expensive for noncommercial – as well as some commercial – speakers who have Web sites to verify that their users are adults." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 876-877, 117 S.Ct. 2329 (1997). And, "For the vast majority of communications over the Internet, including all communications over the Web, e-mail, newsgroups, mail exploders, and chat rooms, it is not technologically possible for a speaker to determine the age of a user who is accessing such communications. " *Cyberspace Communications, Inc. v. Engler*, 55 F.Supp.2d 737, 743 (E.D. Mich. 1999), aff'd 238 F.3d 420 (6th Cir. 2000).

### New Role of Chat Rooms and Internet Communication

38. The final aspect of the factual depiction of Internet chat rooms and related Internet communications is that they have recently come to play a new and more important role in the United states as places to meet and interact for personal, social, entertainment, political, and other purposes. It is not an exaggeration to say that they have become the community centers and singles bars of the new century, at least for the computer literate segments of our society.

39. In addition to the IRC networks with tens of thousands of chat rooms, the online portals (AOL, MSN, Yahoo, et al.) have a multitude of proprietary chat rooms on a wide variety of subjects. These are utilized both for people to pursue topics of interest and to meet other people with those same interests. In addition, web

17

sites abound that serve the same purpose. For example, Friendster.com depicts itself as follows: "Friendster is the fun and safe way to organize your social life," adding, "Find out why more than 13 million people have joined Friendster, the FREE online service to: *Stay in touch with your friends, *Meet new people through your friends, *Have fun browsing people who share similar interests..." http:/www.friendster.com. A million students at over 300 colleges use Thefacebook.com to stay in touch with classmates. You have to have a school e-mail address to register, and can access only others at your school. www.Thefacebook.com. For a different segment of society, The Chicago Tribune on February 10, 2005 (section 5, p.7), reported on redneckandsingle.com, for "rednecks looking for love on the Internet."

40. Forbes has reported, "Online dating is a major social phenomenon – and a business phenomenon, too....*The New York Times*, for instance, has, in the past month, run feature stories on online dating mores not just in its style section, but as a cover story in its magazine, and even on its op ed page. Thousands have met and fallen in love. Millions have met and never seen each other again....So AOL's arrival signals that online dating has arrived – or that it is, like, so over....All dating sites let users post photos and profiles, and troll for other profiles in turn. But they generally require waiting for e-mails to initiate contact, which could take minutes or even hours...AOL will leverage its instant messaging system, which has 50 million active users....'On-line personals powered by instant messaging are the

18

next step in the evolution of online dating services,' Stephen McArthur, executive vice president of AOL Messaging, told the AP...McArthur said this is better since people who use instant messaging are logged on to the service an average of about four hours a day, while subscribers to other dating services only spend 15 minutes a day on their sites." *AOL Finds Love - Finally*, Forbes, Dec. 10, 2003, available at Forbes.com.  The Chicago Tribune has also reported on web sites that for a fee help people to write their online personals, such as www.profiledoctor.com. (Chicago Tribune, January 4, 2005, section 5, page 2).

41.   A subset of this area are Internet sites that overtly serve as match making services, which are also growing.  As U.S. News and World Reports reported last year, "Across the country, a record 40 percent of American adults are single, making them one of the fastest-growing segments of U.S. households today.  And in search of love, or at least a decent date, fully half of them – 40 million Americans – visited an online site last month.  It is, researchers say, nothing short of a social revolution."  The article further related, "online matchmaking services more than quadrupled their revenues to $302 million from 2001 to 2002.  Indeed, online personals are now the most lucrative segment of paid services on the Web, according to comScore Networks - eclipsing digital music sharing services, online investment advice, research services like Lexis Nexis, and gossip and entertainment sites – including what the industry calls 'mainstream adult' sites like Playboy." *Love.com*, U.S. News and World Reports, Sept. 29, 2003, pp. 52-58,

19

available at www.usnews.com. Indeed, Yahoo Personals claims four million visitors a month to its site, and Match.com says that it has "more than 8 million members profiles posted or who are active users." Match.com recently took out a full page ad in, of all places, The New Yorker magazine's 2005 annual Valentine Day issue, February 14 & 21, 2005. Attached as Exhibit 14.

42. The Internet has thus become a central vehicle for social interaction that takes a variety of forms. And there is also overlap among the various fora. For example, Forbes has reported that, Match.com is a unit of Ticketmaster and has formed a new division named MatchLive, which "is organizing salsa-dancing mixers, walking tours and cooking classes in four major cities, including Chicago and Los Angeles." *Sex and the City*, Forbes, Feb. 17, 2003, available at Forbes.com.

43. This area is hardly limited to social activities. Howard Dean's presidential bid was organized around both fund raising and volunteers recruited and organized on the Internet. Similarly, Moveon.org has an invitation on its website to "Join our network of more than 3,000,000 online activists, one of the most effective and responsive outlets for democratic participation available today."

44. Chat rooms and related interaction on the Internet thus have become an integral a part of the new social universe. Meeting and interacting on the Internet has become a central part of the lives of millions of Americans, with the curve skewed to younger age groups who are more computer literate. Consequently, Mr. Cote's participation in the IRC chatroom Younggirlsex is a part of a new online

world that is a central element of contemporary American society.

## Nature of Child Abuse Problem

45. Finally, for purposes of establishing that the government has not used the least restrictive means to address the governmental interest that it will undoubtedly claim in this case, defendant presents a short synopsis of the current child abuse situation, in general, and the known incidence of Internet sexual exploitation, in particular. The National Clearinghouse on Child Abuse and Neglect Information of the U.S. Department of Health and Human Services provides the following statistics on the maltreatment of children up to age 17 (excerpts of *Child Maltreatment 2002* attached as Exhibit 15). In 2002, the latest year for which data is available, 896,000 children were found by state and local governmental agencies to be victims of maltreatment, based upon investigations of reports of 3,193,000 possible victims. Of the 896,000, 60.5 percent were neglected (including medical neglect); 18.6 were physically abused; 9.9 percent were sexually abused; and 6.5 percent were emotionally or psychologically maltreated. Overall, 40.3 percent were maltreated by their mothers acting alone; another 19.9 percent were maltreated by their fathers acting alone; 18.0 percent were maltreated by both parents; and 13.o percent were maltreated by a non-parental perpetrator.

46. With respect to perpetrators of sexual abuse, 2.5 percent were abused by a parent; 28.9 percent were abused by another relative; 5.3 percent were abused by a foster parent; 16.4 percent were abused by a residential facility staff member;

21

19.3 percent were abused by a child day care provider; 11.2 percent were abused by an unmarried partner of the parent; 4.3 percent were abused by a legal guardian; 36.3 percent were abused by other known persons, including camp counselors, school employees, and hospital staff; and in 21.8 percent of the cases the perpetrator was not identified.

47. Similarly, the American Academy of Pediatrics currently reports on its website that, "Sexual abuse of children is a harsh facts of life in our society. It is more common than most people realize. Some surveys say at least 1 of 5 adult women and 1 of 10 adult men report having been sexually abused in childhood....Boys and girls are abused in this way most often by adults or older children who are known to them and who can exert power over them. The victim knows the offender in 8 of 10 reported cases. The offender is often an authority figure whom the child trusts or loves." American Academy of Pediatrics, "What Is Cild Sexual Abuse?", attached as Exhibit 16.

48. The first academic study of the nature of Internet encounters and sexual overtures is just beginning to appear. At the annual meeting of the American Psychological Association in August, 2004, a paper was presented entitled, "Internet-initiated Sex crimes Against Minors: Implications for Prevention Based on Findings from a National Study," which was then published in the November, 2004 issue of the Journal of Adolescent Heath. The three authors are two Ph.D. and a J.D. at the University of New Hampshire's Crimes Against Children Research

22

Center. The paper reported that the study was based upon "a national survey of a stratified random sample of 2574 law enforcement agencies conducted between October 2001 and July 2002." The survey asked about all arrests for Internet-related sex offenses with victims under 18 between July 1, 2000, and June 30, 2001. It resulted in a sample of 1723 cases.

49. The key finding were: 1) Seventy-six percent of the victims were between 13 and 15, whereas "The offenders were much older than their victims. Seventy-six percent were age 26 or older;" 2) "Most first encounters between offenders and victims (76%) took place in online chat rooms. The chat rooms included sites oriented to teens, to specific geographic locations, to dating and romance, to gays and in a few cases to sexual encounters between adults and minors" (the study does not differentiate between real and fantasy chat rooms oriented to adults and minors); and 3) "Most offenders took time to develop relationships with victims." Internet-initiated Sex crimes Against Minors: Implications for Prevention Based on Findings from a National Study, J. Adolescent Heath, vol. 35, Issue 5, Nov. 2004, attached as Exhibit 17.

50. Finally, defendant Cote submits that law enforcement has utterly failed in this area to develop enforcement strategies that are based upon an objective determination of the incidence crime and the consequent formulation of an enforcement strategy that is most effective in responding to the problem. For example, in the closely related area of child pornography, the National District

23

Attorneys Association and the American Prosecutors Research Institute has posted on its web site an article entitled, "From Fantasy to Reality: The Link Between Viewing Child Pornography and Molesting Children" (identified as Child Sexual Exploitation Update - Volume 1, Number 3, 2004). That article, attached as Exhibit 18, states, "According to the United States Postal Service, at least 80% of purchasers of child pornography are active abusers and nearly 40% of the child pornographers investigated over the past several years have sexually molested children in the past." As authority for that quote the article cites, "Stopping Child Pornography: Protecting Our Children and the Constitution," before the Senate Comm. on the Judiciary, 107th Cong. (2002), Statement of Ernie Allen, Director, The National Center for Missing and Exploited Children. The statement itself is not made available. Defendant Cote submits that these claims are patent nonsense for which no substantiation actually exists.

51. But claims like the foregoing do, in fact, form the basis for law enforcement policy. On November 17, 2004, Andrew Oosterbaan, who is Chief of the Child Exploitation and Obscenity Section, Criminal Division, of the U.S. Department of Justice, appeared at a Federal Bar Association luncheon held at the Chicago Bar Association, and repeated some of the statistical claims set forth above, and handed out several publications that were jointly prepared by the Department of Justice and the National Center for Missing and Exploited Children, the source of the purported statistics in the preceding paragraph. The cover pages of the

24

brochures are attached in Exhibit 19. Mr. Oosterbaan was accompanied by the Child Exploitation Coordinator in the local U.S. Attorney's Office, AUSA Virginia Kendall. Speaking as a Justice Department section chief, Mr. Oosterbaan, in addition to praising the National Center for Missing and Exploited Children, explicitly criticized the recent U.S. Supreme Court child pornography decisions, including *Ashcroft v. American Civil Liberties Union*, __ U.S. __, 124 S.Ct.783 (2004), as impeding law enforcement's ability to fight child pornography. Defendant Cote's counsel was present, but became uncertain as to whether he was at a bar association meeting or had stumbled into a religious revival assembly.

## MOTION TO DISMISS STANDING AND STANDARD

52. The defendant is moving to dismiss the indictment. Ordinarily a motion to dismiss is limited to challenging whether the wording of the indictment sufficiently alleges an offense. See, *e.g., United States v. Sandoval*, 347 F.3d 627, 633 (7th Cir. 2004). However, there are well recognized exceptions, particularly when the very bringing of the charge causes an infringement on Constitutionally protected rights of the accused. This case presents such a situation.

53. The doctrine arises from *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116 (1965), which states that there are cases implicating constitutional rights in which "the statutes lend themselves too readily to the denial of those rights. The assumption that defense of a criminal prosecution will...assure ample vindication of constitutional rights is unfounded in such cases." 380 U.S. at 479.

54. Thus, "whether or not a prosecution...encroaches on constitutionally protected speech is a question appropriately decided by the court as a threshold matter." *United States v. Baker,* 890 F. Supp. 1375, 1385 (E.D. Mich. 1995). *Baker* cites and quotes *Dennis v. United States,* 341 U.S. 494, 71 S.Ct. 857 (1951), "'when facts are found that establish the violation of a statute, the protection against conviction afforded by the First Amendment is a matter of law' requiring a judicial determination." *Baker,* 890 F.Supp. at 1385.

55. The Fifth Circuit, in recognizing a right to have a pretrial determination of the application of the First Amendment to an indictment stated, "the chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure." *United States v. P.H.E., Inc.,* 965 F.2d 848, 857 (5th Cir. 1992). In support, the Court cited *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524 (1985), "The decision to prosecute may not be 'deliberately based upon an unjustified standard'...including the exercise of protected statutory and constitutional rights." This doctrine has been most often invoked where there is an allegation of an improper purpose on the part of the prosecutor. But the previously cited cases demonstrate that it extends to cases in which the result of the prosecution is the deprivation of the defendant's constitutional rights, and can have the consequence of a chilling effect on other persons in the defendants posture, in this case other persons using IRC fantasy chat rooms who are subject to the jurisdiction of the United States courts.

## SUMMARY OF ARGUMENT

56. The prosecution in this case suffers from two legal infirmities. First, it is the product of law enforcement exceeding its permitted bounds by entering and interfering with a Constitutionally protected sphere of free speech, intimate association, and privacy, namely communications in an adult Internet chat room, with no prior suspicion that any unlawful activity had been occurring there. Second, defendant Cote, who has a prior history of assignations arranged on the Internet with adult women, but no history of, much less criminal arrest or conviction for, any unlawful activity involving minors, was then lured to Illinois, where he met a adult, female Cook County Sheriff's police officer. This prosecution is not narrowly tailored to achieve a compelling law enforcement objective. Rather, it is Constitutionally impermissible because it charges the defendant with traveling with Constitutionally protected thoughts, and with no objective corroboration of any unlawful intent, resulting in a violation of Mr. Cote's right to travel, in addition to his rights of free speech, intimate association, and privacy.

## FIRST AMENDMENT

57. The use of communications on the Internet, including communicating in and through chat rooms, has, as discussed above, become central to the fabric of contemporary American society. Yet the government is increasingly intruding into this arena, without any standards and with the Courts imposing virtually no legal constraints.

27

58. In this case, Mr. Cote was in what was clearly an adult chat room. This was not a cyber locale in which real children would be expected to be. Consequently, the Cook County Sheriff's officers did not have a compelling need or pre-existing articulable reason to enter that chat room and interject themselves into Mr. Cote's chat. As discussed below, Mr. Cote's communications in the that #O!!!!!!!!!!!!younggirlsex chat room were speech that was protected under the First and Fourteenth Amendments. The government's institution of this case through its intrusion into the chat room violated that protection.

59. The Defendant first challenges this prosecution as being an application of §2423(b) that is unconstitutional under the First Amendment. "It is a proper exercise of judicial restraint for courts to adjudicate as-applied challenges before facial ones in an effort to decide constitutional attacks on the narrowest possible grounds..." *Commodity Trend Services v. Commodity Futures Trading Comm.*, 149 F.3d 679, 689 (7th Cir. 1998). Therefore, Mr. Cote is not asserting that the statute cannot be applied to, for example, previously convicted pedophiles, or to defendants apprehended communicating with real minors. Rather, this motion seeks to demonstrate that the government is enforcing the statute in question in this case in an unconstitutional manner, as part of a growing pattern of unwarranted intrusion by law enforcement on the daily lives of vast numbers of ordinary Americans who now regularly go to chat rooms (and elsewhere on the Internet) to engage in social, recreational, and political activity.

28

60. The Supreme Court has stated the following pertinent First Amendment principles:

> The First Amendment commands, "Congress may make no law...abridging the freedom of speech." The government may violate this mandate in many ways...but a law imposing criminal penalties on protected speech is a stark example of speech suppression.
> The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere. Under this principle, [a law] is unconstitutional on its face if it prohibits a substantial amount of protected expression.
> *Ashcroft v. The Free Speech Coalition*, 535 U.S. 234, 244, 122 S.Ct. 1389 (2002).

61. The Court went on to recognize that "Congress may pass valid laws to protect children from abuse, and it has...The prospect of crime, however, by itself does not justify laws suppressing protected speech...It is also well established that speech may not be prohibited because it concerns subjects offending our sensibilities...see also, *Reno v. American Civil Liberties Union*, 521 U.S. 844, 874, 117 S.Ct. 2329, 139 L.Ed.2d 874 (1997) ("In evaluating the free speech rights of adults, we have made it perfectly clear that '(s)exual expression which is indecent but not obscene is protected by the First Amendment.'")". *Id. at 245.*

62. The Court further stated, "As a general principal, the First Amendment bars the government from dictating what we see or read or speak or hear....The CPPA prohibits speech despite its serious literary, artistic, political, or scientific value. The statute proscribes the visual depiction of an idea – that of teenagers engaging in sexual activity – that is a fact of modern society and has been a theme in art and literature through the ages...Both themes – teenage sexual activity and the sexual

29

abuse of children – have inspired countless literary works. William Shakespeare created the most famous pair of teenage lovers, one of whom is just 13 years of age." *Id. at 245-247.* Substitute *Lolita* for *Romeo and Juliet* and you have the issue presented in this case.

63. The Supreme Court has further recognized a personal right to receive information. As Justice Brennan wrote, "the dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them...[for] it would be a barren marketplace of ideas that had only sellers and no buyers." *Lamont v. Postmaster General,* 381 U.S. 301, 308, 85 S.Ct. 1493 (1965). The Third Circuit extensively explores the development of constitutional right to receive information in *Kreimer v. Bureau of Police for Town of Morrison,* 958 F.2d 1242, 1250 *et seq.* (3rd Cir. 1992).

64. Moreover, the Supreme Court has made it clear that actions that burden speech are no more permissible than acts banning speech: "The distinction between burdening and laws banning speech is but a matter of degree. The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *United States v. Playboy Entertainment Group, inc.* , 529 U.S. 803, 812, 120 S.Ct. 1878 (2000). Thus, burdening Mr. Cote's chat room speech by intruding on it with an undercover agent and arresting him as a consequence of it are impermissible, just as banning Mr. Cote from the chat room or banning the chat room from operation would be.

65. Several courts have recognized the chat room speech comes within the protection accorded communications on the Internet. One case enjoined the enforcement of a Virginia criminal statute penalizing the sale of sexual materials defined as harmful to minors. That court found that the act was invalid because it "applies broadly to the Internet and the many different communication formats it encompasses, including newsgroups, bulletin boards and chat rooms," and it imposed an unjustified burden on protected speech by chilling "the willingness of adults to access adult web sites." *PSINET Inc. v. Chapman*, 167 F.Supp. 878, 889-890 (W.D. Va. 2001). In another case a similar New York criminal statute that made it unlawful to communicate sexual materials that were harmful to minors was enjoined. That court found that the Internet "includes a wide variety of online discussion fora that allows groups of users to discuss and debate subjects of interest," including chat rooms. The case went on to describe chat rooms in some detail. *American Libraries Assn. v. Pataki*, 969 F.Supp. 160, 165-166 (S.D.N.Y. 1997). Using the same strict scrutiny test that is applied under the First Amendment, but invoking the Commerce Clause, the court enjoined enforcement of the statute on the grounds that it was not narrowly tailored. *Id.* at 179. Finally, a district court in Michigan found that a Michigan statute criminalizing dissemination of sexual materials to minors over the Internet did not meet a strict scrutiny analysis. The Internet setting was described as follows: "the Internet serves as the communications medium for tens of thousands of global

31

conversations, political debates, and social conversations." *Cyberspace Communications v. Engler*, 55 F.Supp.2d 737, 741 (E.D. Mich. 1999).

66. The investigation and prosecution of this case have been based upon an unwarranted intrusion by the government into an Internet chat room. Such an investigation, as well as prosecution, must be conducted in conformity with the Constitution. "Investigation is a part of lawmaking and the First Amendment, as well as the Fifth, stands as a barrier to state intrusion of privacy." *Gregory v. Attorney General of the State of New Hampshire*, 383 U.S. 825, 829, 86 S.Ct. 1148, 1151 (1966); "The Bill of Rights is applicable to investigations as to all forms of governmental action." *Warren v. United States*, 354 U.S. 178, 188, 77 S.Ct. 1173, 1179 (1957); and, "a legislative investigation – as any investigation – must proceed 'step by step,'...but step by step or in totality, an adequate foundation for the inquiry must be laid before proceeding in such a manner as will substantially intrude upon and severely curtail or inhibit constitutionally protected activities or seriously interfere with similarly protected associational rights." *Gibson v. Florida Legislative Investigative Committee*, 372 U.S. 539, 557, 83 S.Ct. 889, 899 (1963).

67. The government's investigation in this case constitutes a declaration that governmental agents are entitled to duplicitously intrude themselves into all of the Internet forums discussed in the statement of facts: chat rooms, e-mail correspondence (chat room private messaging is indistinguishable from e-mail), instant messaging, bulletin boards, blogs, etc. The government acknowledges no

limits to its entitlement to monitor the public's communications or to communicate directly with chat room participants through its agents who have assumed false identities.

68. At a time when a large portion of the public is turning to the Internet to engage in social, entertainment, and political activity, such governmental action has a great potential for creating a chilling effect on such activity. Constitutionally impermissible chilling effects are well recognized, as stated in *Gibson* in paragraph 55, above. The danger is particularly acute in the case of a criminal statute, as the Supreme Court has observed: "The CDA threatens violators with penalties including up to two years in prison for each act of violation. The severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 872, 117 S.Ct. 2329, 2344-5 (1997). Accord, *American Libraries Assn. V. Pataki*, 969 F.2d 160, 179 (S.D.N.Y. 1997): "The chilling effect that it produces is bound to exceed the actual cases that are likely to be prosecuted, as Internet users will steer clear of the Act by a significant margin."

69. The speech and expressive communication in this case, which involves older men engaged in role playing with others purporting to be young girls, is undoubtedly offensive to many people. However, that does not lessen the constitutional protection that it receives. "The Fourteenth Amendment does not

33

permit a State to make criminal the peaceful expression of unpopular views."

*Edwards v. South Carolina.* 372 U.S. 229, 237, 83 S.Ct. 680, 684 (1963); and "As

we stated in *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d

1073 (1978): (T)he fact that society may find speech offensive is not sufficient

reason for suppressing it." *Hustler Magazine v. Falwell,* 485 U.S. 46, 55, 108 S.Ct.

876, 882 (1988).

70. As applied to this case, the actions of the Cook County Sheriff's Police in

intruding into an adult fantasy chat room with no prior, articulable knowledge that

Mr. Cote or anyone else was violating the law in that chat room constituted a

violations of Mr. Cote's rights under the First and Fourteenth Amendments. The

chat room was a private forum dedicated to a public use. As such it was entitled

to constitutional protection. *Cornelius v. NAACP Legal defense & Ed. Fund, Inc.,*

473 U.S. 788, 801, 105 S.Ct. 3439, 3448 (1995); *Denver Area Educational*

*Telecommunications Consortium, Inc. V. Federal Communications Commission,* 518

U.S. 727, 749, 116 S.Ct. 2374, 2388 (1996).

71. The content of the fantasy chat in which Mr. Cote engaged with others in the

public and private chat sessions was expressive communication entitled to

protection under the First and Fourteenth Amendments. The fantasies and role

playing in the chat room were both a form of expressive communication and a form

of entertainment entitled to constitutional protection. "(E)ven...low grade

entertainment was entitled to First Amendment protection." *IOTA XI Chapter of*

34

*Sigma Chi Fraternity v. George Mason University*, 993 F.2d 386, 391 (4th Cir. 1993). The Supreme Court accorded First Amendment protection to dial-a-porn phone lines in *Sable Communications of California v. FCC*, 492 U.S. 115, 109 S.Ct. 2829 (1989). The Seventh Circuit has held that the playing of violent video games by minors is protected by the First Amendment. *American Amusement Machine Association v. Kendrick*, 244 F.3d 572, 579 (7th Cir. 2001). This is very similar to fantasy role playing in chat rooms. And a district court judge in Michigan dismissed an indictment in which the defendants were charged with sending e-mail threats to injure a third party. The court characterized the private e-mails as "shared fantasies" involving sexual violence against a woman. The court held that the messages were protected by the First Amendment, and did not rise to the level of "true threats," which are unprotected under the statute involved and the First Amendment. *United States v. Baker*, 890 F.Supp. 1375 (E.D. Mich. 1995); aff'd on other grounds *sub nom. United States v. Alkhabaz*, 104 F.3d 1492 (6th Cir. 1997). In short, "The line between the transmission of ideas and mere entertainment is much too elusive for this Court to draw, if indeed such a line can be drawn at all." *Stanley v. Georgia*, 394 U.S. 557, 566, 89 S.Ct. 1243, 1248-9 (1969).

72. The Supreme court has also been emphatic that "protected speech does not become unprotected merely because it resembles the latter." *Ashcroft v. The Free Speech Coalition*, 535 U.S. 234, 255, 122 S.Ct. 1389 (2002); accord, *United States v. Hilton*, 386 F.3d 13, 18 (1st Cir. 2004). Mr. Cote's fantasy speech does not

become speech supporting intent for actual solicitation of a minor simply because it resembles it.

73. It is evident from the caselaw that the question is whether the parties are engaged in expressive communication, and not whether there is an audience receiving the message. For example, a Vietnam War era protestor was convicted under a Washington State statue for improperly displaying an American flag, which was hung upside down with a peace symbol taped on it. The Supreme Court reversed on the grounds that the conviction impermissibly infringed on protected expression, where the Court found that, "on the facts stipulated by the parties there is no evidence that anyone other than the three (arresting) police officers observed the flag." *Spence v. State of Washington,* 418 U.S. 405, 409, 94 S.Ct. 2727 (1974). Similarly, the Supreme Court reversed the conviction under the Ohio Criminal Syndicalism statute of a member of the Ku Klux Klan for burning a cross, which was filmed and later broadcast. At the actual burning, however, "No one was present other than the participants and the news man who made the film." *Brandenburg v. Ohio,* 395 U.S. 444, 1828-9, 89 S.Ct. 1827 (1969). Finally, the Supreme Court reversed the conviction for unauthorized wearing of a military uniform by a participant in a street skit held more than once in front of the Armed Forces Induction Center at Houston, Texas. However, there is no indication in the opinion that anyone actually watched the skit being performed. The fantasy role playing between Mr. Cote and his interlocutors in the chat room did have an

36

audience when the messaging was being conducted in the general chat room, and remained expressive conduct when being conducted between two participants via instant messaging, e-mail, or telephonically.

74. The most extensive discussion of the meaning of expressive communication is found in Judge Posner's concurring opinion in *Miller v. Civil City of South Bend*, 904 F.2d 1081, 1089-1104 (7th Cir. en banc 1990)(rev'd on other grounds *sub nom.*, *Barnes v. Glen Theatre*, 501 U.S. 560, 111 S.Ct. 2456, 1991). Judge Posner extensively explores the nature of the expression encompassed in the protective sphere of the First Amendment. He notes that the First Amendment cannot be limited to the protection of political speech. Rather, it extends to "expressive activity concerned with the emotions as well as expressive activity concerned with ideas," 904 F.2d at 1098, and it includes art, music, dance, science, and other forms of communication and expression. For example, he writes, "Music is one of the oldest forms of human expression. From Plato's discourse in the Republic to the totalitarian state in our own times, rulers have known its capacity to appeal to the intellect and to the emotions, and have censored musical compositions to serve the ends of the state. The Constitution prohibits any like attempt in our own legal order." 904 F.2d at 1096.

75. Judge Posner also seeks to find limits for the First Amendment. For example, he observes that bull fighting is expressive activity, but it can be banned because it entails mutilating or killing the bulls and physically endangering the matadors,

and "in American society its harmful consequences are thought to outweigh its expressive value." 904 F.2d at 1097. More pertinent to this case, he also tries to draw essentially a lower limit to First Amendment protection, concerning communication that invokes *de minimus* First Amendment concerns. He mentions social dancing, citing *City of Dallas v. Stanglin*, 490 U.S. 19 (1989) and "casual chit chat," citing his opinion in *Swank v. Smart*, 898 .2d 1247 (7th Cir. 1990), and giving as his only example that, "a public theater that ejects a patron for talking with his neighbor during the performance of a play does not commit a prima facie violation of the First Amendment." 904 F.2d at 1097. *Dallas v. Stanglin* was a right of association, rather than right of expression case. The owner of a roller rink that held teenage dances challenged the constitutionality of a Dallas ordinance regulating such dances that, in the interest of ensuring the safety and welfare of children, barred patrons over 18 years of age from the dances, which were for 14 to 18 year olds. The Supreme Court concluded, "we do not think the Constitution recognizes a generalized right of 'social association' that includes chance encounters in dance halls." 490 U.S. at 25.

76. Mr. Cote agrees that there may be a *de minimus* limit to First Amendment protections, just as First Amendment values can be over-ridden by other values of society, which is discussed further below. But the defendant submits that Judge Posner is also correct that the First Amendment today protects a broad range of expressive communication, and Mr. Cote's fantasy role playing in the adult chat

room is well within the arena of entertainment and expressive communication that receive First Amendment protection. Moreover, the public attention that the issue of young girls being taken advantage of by older men has received renders the subject of the chat room a matter of public concern, enhancing its First Amendment protection. As Judge Posner wrote about the nude dancers in the Kitty Kat Lounge, "lest its suppression turn out to be the first step on the road back to the institutionalized Puritanism of Cromwell's reign – during which all theatrical performances, including the performances of Shakespeare's plays, were prohibited – we need a principled ground for distinguishing the striptease (or some subcategory of striptease typified by the dancers at the Kitty Kat Lounge) from other forms of nonobscene erotic expression. None has been suggested." 904 F.2d at 1098. There is likewise no principled ground for distinguishing Mr. Cote's fantasy role play.

77.     Finally, *Swank v. Smart* is a public employment case, in which the issue is whether a brief conversation between the plaintiff police officer and a student whom he gave a ride on his motorcycle was protected speech. Judge Posner invoked the requirement that public employees be speaking about matters of public concern to invoke First Amendment protection from adverse employment actions, a considerably more restricted type of speech than is protected in an Internet chat room, as Judge Posner's opinion in *Miller* shows. Mr. Cote's expressive communications in the fantasy chat room involve matters of

39

significantly greater social import than the idle chit chat of *Swank v. Smart,* and they took place in a setting whose rising role in the lives of million of Americans renders it in considerably greater need of protection from governmental intrusion.

## Nature of the First Amendment Violation

78. The investigation in this case was conducted and the case was thereby instituted in violation of Mr. Cote's rights under the First Amendment because the action of the governmental agents created an impermissible chilling effect, constituted an impermissible prior restraint, and rendered the statute impermissibly vague and overbroad.

a. Vagueness. "Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize arbitrary and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales,* 527 U.S. 41, 56, 119 S.Ct. 1849 (1999).

The meaning of the statute consists of the actual wording and the judicial interpretation as of the time of the charged offense. *United States v. Lanier,* 520 U.S. 259, 266, 117 S.Ct. 1219 (1997). More particularly, "the vagueness doctrine bars enforcement of 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application,'" and, moreover, "the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so

40

resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *United States v. Lanier*, 520 U.S. at 266.

The second test is that "(t)he broad sweep of the ordinance also violates 'the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *City of Chicago v. Morales*, 527 U.S. at 60. The Supreme Court has further stated, "the more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine – the requirement that a legislature establish minimal guidelines to govern law enforcement'....Where the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Kolander v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855 (1983). For example, in the area of curfew laws, "every reported federal case in which a curfew law has been upheld against constitutional challenge has involved a curfew law with significantly broader exceptions, including an explicit First Amendment exception." *Hodgkins v. Goldsmith*, 2000 WL 892964 *14 (S.D. Ind. July 3, 2000). Finally, the fact that a statute also encompasses conduct validly criminalized does not save it from a vagueness challenge. "(A) generally worded statute, when construed to punish conduct which cannot be constitutionally punished, is unconstitutionally vague. And the possibility of disorder by others cannot justify exclusion of persons from a place if they

41

otherwise have a constitutional right...to be present." *Wright v. Georgia*, 373 U.S. 284, 293, 83 S.Ct. 1240 (1963).

In this case, the statute covers both protected and unprotected speech and conduct, leaving law enforcement officers and prosecutors unfettered and unguided to apply their personal standards for how and why to effect arrests and prosecutions under the statute. In this situation, it is actually not surprising that Mr. Cote's was arrested for conduct protected by the First and Fourteenth Amendments, because he was an easy catch. A person of common intelligence in an adult fantasy chat room, where the presumably adult participants are adopting false identities, is not going to think that he is committing a crime by engaging in erotic chat with another person in the adult chat room posing as a minor and then arranging to meet them, just as Mr. Cote had previously met adult women he had encountered elsewhere in the Internet. A statute that allows for such law enforcement intrusion into constitutionally protected expressive conduct is vague as applied and may even be facially vague.

b. Overbreadth. "(A) governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedom." *Zwickler v. Koota*, 389 U.S. 241, 250, 88 S.Ct. 391 (1967). The Supreme Court recently stated more particularly, "the overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the

42

impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *City of Chicago v. Morales, supra,* 527 U.S. at 52. Finally, the Iowa Supreme Court recently declared unconstitutional a provision of an Iowa statute criminalizing attempting to entice away a minor. The provision that was found to be overbroad, both on its face and as applied, because it allowed intent to violate the statute to "be inferred when the person is not known to the person being enticed away and the person does not have the permission of the parent, guardian, or custodian to contact the person being enticed away." The court concluded that the statute "proscribes protected speech and the statute cannot be narrowed to cover only nonprotected speech." *State v. Quinn,* __ N.W.2d __, 2005 WL 26637 (Iowa, Jan. 5, 2005).

Defendant is not contending, at least for vagueness and overbreadth purposes, that the statute cannot have legitimate applications, such as when law enforcement officers are tracking a previously convicted pedophile in a true teenage chat room or where law enforcement has been told that an actual minor has been approached online, and the officers take over the identity of that actual minor. Moreover, defendant is not in a position to quantify the extent to which law enforcement is engaged in intrusion on constitutionally protected expressive communication. However, in the First Amendment context the defendant is entitled to invoke the rights of the chat room owners. The over-reaching then becomes substantial, and facial overbreadth comes into play. At the very least, if

43

the government maintains that the application of the statute to Mr. Cote is permissible, then the statute is overbroad as it has been applied to him.

c. Chilling Effect. The Seventh Circuit has stated that simply threatening a person with arrest, much less actually arresting that person, "undoubtedly had a chilling effect of the plaintiffs' exercise of their rights, in fact deterring them from exercising those rights." *Chicago Area Military Project, et al. v. City of Chicago, et al.*, 508 F.2d 921, 926 (7th Cir. 1975). Similarly, a judge in the Southern District of New York held that, again, the prospect of "arrest under the defendants' interpretation of the ordinance...has an obvious chilling effect upon plaintiffs' First Amendment rights." *Boe, et al. V. Colello*, 438 F.Supp. 145, 151 (S.D.N.Y. 1977). And, another Southern District of New York judge held that where an artist was arrested for selling artwork without a vendor's license, the officer's action in making the arrest "had an immediate and specific chilling effect on plaintiff in that he was unable to continue his demonstration and his First Amendment activities were cut short." *Lederman v. Adams, et al.*, 45 F.Supp.2d 259, 269 (S.D.N.Y. 1999). The actions of the officers and prosecutors in this case similarly have an obvious chilling effect on users and operators of fantasy chat rooms.

d. Closely related to the concept of a chilling effect is the bar on prior restraints. "An ordinance which...makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official...is unconstitutional censorship or prior restraint upon the enjoyment of those

44

freedoms." Staub v. Baxley, 355 U.S. 313, 322, 78 S.Ct. 277, 282 (1958). In that case a woman went door to door to the homes of several persons in the City of Baxley, Georgia, and spoke with them about joining a union. She was convicted of violating a city ordinance that required a permit to "solicit membership in any organization, union or society of any sort," and "sentenced to imprisonment for 30 days or to pay a fine of $300." Id. at 278-9. Today, such organizing might well be done by e-mail or through a discussion in an Internet chat room. Arrests for other forms of expressions have been found to constitute prior restraints. "In the instant case the police officer acts as a censor for all intents and purposes. After he has made the determination that a dancer is violating A.R.S. Sec. 13-531 he exercises the most effective form of prior restraint by arresting the dancer during the performance or immediately thereafter thus precluding further performances by that dancer..." *Attwood v. Purcell*, 402 F.Supp. 231, 237 (D. Ariz. 1975). Similarly, Judge Shadur has written about the Constitutional consequences when "on February 8, 1991 the police...arrested all dancers present at Admiral's premises based upon the officers' beliefs that the dancers' expressive conduct was obscene and hence not protected by the Constitution." Judge Shadur noted that "a prior restraint may occur where communication is suppressed, either directly or by inducing excessive caution in the communicator, without a prior judicial determination that the speech is unprotected by the First Amendment." And he concluded that as long as it is "conduct with a significant expressive element," then

45

the State can act against it only "(1) to promote a compelling interest and (2) if it chooses the least restrictive means to further that interest," citing *Sable Communications of California, Inc. V. FCC*, 492 U.S. 115, 126 S.Ct. 2829 (1989). *Admiral Theatre v. City of Chicago*, 832 F.Supp. 1195, 1203-4 (N.D.Ill. 1993).

### FREEDOM OF INTIMATE ASSOCIATION

79. The Supreme Court described freedom of association in *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244 (1984), stating, "in one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty." *Id.* at 617-618. This type of freedom of association has come to be called freedom of intimate association.

80. The other type of freedom of association is "the right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for redress of grievances, and the exercise of religion." *Id.* 618. This type of freedom of association has come to be called freedom of expressive association.

81. The Court went on to say that, "the Court has long recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the

formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State." *Id.* at 618. Initially this right was applied to family relationships, but its sphere has subsequently been expanded. "At a minimum, it extends to relationships that 'attend the creation and sustenance of a family – marriage, childbirth, the raising of and education of children, and cohabitation with one's relatives.'...Whether the right extends to other relationships depends on the extent to which those relationships share the characteristics that set family relationships apart – small, select, and secluded from others." *Sanitation and Recycling Industry, Inc. v. City of New York*, 107 F.3d 985, 996 (2nd Cir. 1997). The right is based upon Fourteenth Amendment substantive due process, and substantially overlaps with the right of privacy. *Griffin v. Strong*, 983 F.2d 1544 (10th Cir. 1993).

82. From 1993, when *Roberts v. Jaycees* was decided, until 2003, the lower courts were not entirely uniform in their application of the right of intimate association. Certain limits were recognized. For example, it was not applied to associating with a paid escort from an escort service. *IDK, Inc. V. Clark County*, 836 F.2d 1185, 1193 (9th Cir. 1988). And a dance hall owner was required to abide by an ordinance that limited patrons at dances to those between 14 and 18 years old. *City of Dallas v. Stanglin*, 490 U.S. 19, 24-26, 109 S.Ct. 1591 (1989)(prospective patrons over 18 were challenging the ordinance).

83. On the other hand, the right was applied to dating relationships (*Manlove v.*

47

*Town of Hymeral,* 2002 WL 1821815, S.D. Ind., June 18, 2002, Tinder, J.); and to sexual conduct in intimate relationships between unmarried individuals. *Briggs v. North Muskegon Police Department,* 563 F.Supp 585, 590 (W.D. Mich. 1983); *Thorne v. City of El Segundo,* 726 F.2d 459, 468 (9th Cir. 1983). And the scope of the familial right has been broadened as well. A Cincinnati ordinance that established a "drug exclusion zone," barring persons arrested for or convicted of drug crimes from a section of the city, was found to be unconstitutional. The plaintiff, Patricia Johnson, whose children and grand children lived in the zone, was arrested for marijuana trafficking. The court found that it violated the plaintiff's "fundamental freedom of association right to participate in the upbringing of her grandchildren" because the ordinance did not have a mechanism for creating exceptions for situations, such as plaintiff Johnson's, where the application of the ordinance would violate constitutional rights. *Johnson v. City of Cincinnati,* 310 F.3d 484, 501 and 506 (6th Cir. 2002, reh. den. 2003, cert. den 2003).

84. Finally, a number of cases resisted the extension of *Roberts v. United States Jaycees* to non-familial settings, especially where sexual activity between non-married persons was involved. *E.g., Mercure v. Van Buran Township,* 81 F.Supp. 2d 814, 821-822 (E.D. Mich. 2000); *Marcum v. McWhorter,* 308 F.3d 635, 642 (6th Cir. 2002); *Caruso v. City of Cocoa, Florida,* 260 F.Supp.2d 1191, 1207-8 (M.D. Fla. 2003). However, all of the foregoing cases have in common that they relied heavily

on the limitations on the freedom of intimate association suggested in *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841 (1986). Last year, *Bowers* was over-ruled by *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472 (2003), which held unconstitutional the Texas statute that made criminal certain homosexual conduct. The Court stated,

> The petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives then the full right to engage in their conduct without intervention by the government. "It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter."
> *Casey,* supra, at 847, 112 S.Ct. 2891.
> *Lawrence,* 123 S.Ct. at 2484.

85. Thus, cases recognizing an expansive right of intimate association have been strengthened by *Lawrence*, and the cases seeking to limit that right generally do not survive *Lawrence*.

86. Targeting citizens on the Internet with the lure of sex by undercover officers has become a growth industry for law enforcement. This case started with Cook County Sheriff's police officers, who have their own Child Exploitation Unit, that actively works the Internet. Then the FBI was brought in. It should be noted that defendant Cote's actions in this case, as of the time of his arrest, did not violate any law of the State of Illinois. The U.S. Department of Justice now has a separate section in the Criminal Division dealing with these offenses, named the Child Exploitation and Obscenity Section. The FBI also has as an investigative program area named Crimes Against Children, covering child abductions, parental

49

kidnaping, and sexual exploitation of children. Each FBI field office has a Crimes Against Children Coordinator. DOJ and FBI Program statements attached as Exhibits 20 and 21.

87. The Department of Homeland Security has a Major Initiative named Operation Predator in U.S. Immigration and Customs Enforcement. This program is described as follows: "This Operation brings to bear the broadest range of law enforcement authorities in the federal government to target those who exploit young people. Children are one of the most important and vulnerable assets to America's homeland. ICE will do everything in its power to protect them. Operation Predator draws on the full spectrum of intelligence, investigative, cyber, and detention and removal functions of ICE to target those who exploit children. In a way not achievable before the creation of Homeland Security, ICE is coordinating once-fragmented resources into a united campaign against child predators." The first investigative technique that the Operation Predator web page heralds is "ICE is harnessing new intelligence capabilities to target sexual predators." And on July 6, 2004, an ICE press release was issued entitled, "Operation Predator Nabs More Than 3,200 Sexual predators Nationwide in its First Year." ICE Program Statement and News Release attached as Exhibit 22. The Chicago Tribune ran a story on July 28, 2004, with the headline, "Predators who target children sexually have become the prey - In its first year, a federally run program has gone aggressively after pedophiles, arresting more than 3,200 people,

including about 100 in Illinois." Article attached as Exhibit 24.

88. We are thus in the midst of a rapidly growing law enforcement undertaking which has resulted in the arrest and imprisonment of thousands of citizens. Yet the courts have not set any limits on law enforcement in the implementation of a program that receives a great deal of publicity for the law enforcement agencies. The courts have been very slow restrain in any way the undercover officers who are trying to create violations of 18 U.S.C. §§ 2422, 2423(a), and 2423(b) by intruding themselves on the citizenry who are engaged in personal, social, and political Internet activities. The only exceptions are: 1) a handful of cases in which the entrapment defense has been recognized. See, *e.g., United States v. Poehlman,* 217 F.3d 692 (9th Cir. 2000); *United States v. Gamache,* 156 F.3d 1 (1st Cir. 1998); and 2) the corroboration requirement that has been established in some circuit for attempt prosecutions under §2422(b) (see ¶¶ 102 & 103, below). In short, the government has been given free reign to target individuals with no articulable basis for doing so by trolling in chat rooms to lure people into becoming defendants.

## RIGHT OF PRIVACY

89. As the Seventh Circuit has stated, "The 'concept of ordered liberty' protected by the Fourteenth Amendment Due Process Clause has been interpreted to include 'the individual interest in avoiding disclosure of personal matters.' *Whalen v. Roe,* 429 U.S. 589, 599-600, 97 S.Ct. 2777 (1977)..." *Denius v. Dunlap,* 209 F.3d 944, 955 (7th Cir. 2000). *Whalen* further recognized that the right of privacy has been

seen as encompassing "the right of the individual to be free in his private affairs from governmental surveillance and intrusion." *Whalen, supra,* 429 U.S. at 599, Fn. 24. As pertains to this case, the Ninth Circuit has concluded that, "As applied thus far in Supreme Court case law, the freedom of intimate association is coextensive with the right of privacy; both the freedom of intimate association and the right of privacy describe the body of rights that protect intimate human relationships from unwarranted intrusion or interference by the state" *Fleisher v. City of Signal Hill,* 829 F.2d 1491, 1500 (9th Cir. 1987). Based upon the coextensive nature of the right of privacy with that of intimate association, defendant submits that the right of privacy supplements and bolsters his intimate association claim, and both warrant for the same remedy.

## TRAVEL WITH INTENT

90. This case involves Mr. Cote having Internet and telephonic communication with a person he had never met in person; traveling from New York to Chicago; encountering an adult, female deputy sheriff; and immediately being arrested. Defendant submits that the essence of this case is that Mr. Cote is being charged with traveling with thoughts some may find offensive. The law requires objective corroboration of his alleged criminal intent if the indictment is to pass Constitutional muster. Such corroboration is lacking.

91. Numerous cases have analyzed travel in interstate commerce with the intent to engage in a sexual act with a minor as presenting simply an issue of proof as to

52

the defendant's belief concerning the age of the person being met. But that analysis is much too simplistic.

## Meaning of Intent

92.    Mr. Cote is charged as follows: "defendant...did travel in interstate commerce...with the intent and for the purpose of engaging in a sexual act...with 'Lil Mary'..." It involves an odd use of the concept of intent. The *Oxford English Dictionary* defines intent as "the object of an action," and the verb to intend as, "to have in mind as a fixed purpose" (described as the chief current sense). (Oxford University Press, 2002). Here, the conduct that the statute purports to penalize is really travel with the hope to engage in a sexual act. It is a contingent intention because unless the defendant is prepared to forcibly assault the minor, whether or not sex occurs depends upon the willingness of the other party, and the continued desire of the defendant after meeting the other party. One court states that it is enough that the defendant "knowingly sought sexual activity, and knowingly sought it with a minor" (applying 18 U.S.C. §2422(b) *United States v. Meek*, 366 F.3d 705, 718 (9th Cir. 2004). But this is a very expansive reading of the word intent. The Seventh Circuit has stated in interpreting 18 U.S.C. §2423(a), interstate transportation of a minor with the intent to commit aggravated sexual assault, that "a defendant may have more than one purpose in the interstate transportation of a minor...The government need only prove that a 'significant' or 'compelling' purpose of the trip - not the dominant purpose - was to commit

aggravated assault." *United States v. Bonty*, 383 F.3d 575, 578 (7th Cir. 2004). But this statement only begs the question of what intent really means.[3]

## Legislative History

93. In 1998, the Department of Justice sought an amendment to section §2423(b) that would have added to the wording, "A person who travels in interstate commerce...for the purpose of engaging in any sexual act with a person under 18 years of age..." the additional phrase "or an individual who has been represented to the person as not having attained the age of 18 years." The House of Representatives adopted the propose language, but it was not included in the bill that was finally enacted into law. H.R. Rep. No. 105-557 at 27 (1998), reprinted in 19 U.S.C.C.A.N. 696. Thus, the problematic nature of intent in the context of sting operations has been well recognized, but not remedied by the Congress. Moreover, Congress has included language in other statutes providing for intent in the context of sting operations, such as the money laundering statute:

> For the purpose of the offense described in subparagraph (B), the defendant's knowledge may be established by proof that a law enforcement officer represented the matter specified in subparagraph (B) as true, and the defendant's subsequent statements or actions indicate that the defendant believed such representations to be true.
> 18 U.S.C. §1956(a)(2)(B)

---

[3] The defendant assumes from the wording of the indictment that the government is conceding that the defendant had to know, in the sense of believe, that the person he was coming to see was under 18, in order to avoid the potential constitutional problems discussed by Judge Breyer in United States v. Gendron, 18 F.3d 955 (1st Cir. 1994).

94. The over-riding significance of the various aspects of the intent issue is that the prosecution of Mr. Cote in a setting in which he is alleging the violation of several of his constitutional rights in a setting in which it is not clear just what mens rea is required. This should heighten the burden on the government to demonstrate that the prosecution of this case passes constitutional muster.

## Right To Travel

95. The right to travel is a fundamental right. "The constitutional right to travel from one State to another...occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized." *United States v. Guest*, 383 U.S. 745, 757, 86 S.Ct. 1170 (1966). And, "Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic to our scheme of values." *Kent v. Dulles*, 357 U.S. 116, 126, 78 S.Ct. 1113 (1958)(cited with approval, *City of Chicago v. Morales, supra*, 527 U.S. at 52). Government infringement of the right to travel is subject to strict scrutiny. *United States v. Bredimus*, 352 F.3d 200, 209-210 (5th Cir. 2003); *United States v. Brockdorff*, 992 F.Supp. 22, 25 (D.D.C., 1997). A defendant is protected from violation of that right by the Federal government, as well as by the states. *Bethesda Lutheran Homes and Services v. Leean*, 122 F.3d 443, 448 (7th Cir. 1997).

96. The only physical action required of a defendant under the statute in this case

55

is to travel in interstate commerce. The crime has been considered to then be complete upon proof of the defendant's state of mind. It was not so long ago that this was simply not considered sufficient to constitute an offense:

> Congress has no power to punish one who travels in interstate commerce merely because he has the intention of committing an immoral or illegal act at the conclusion of the journey.
> *Caminetti v. United States*, 242 U.S. 470, 491, 37 S.Ct. 192 (1917).

The Seventh Circuit likewise has recognized that "(t)here would be most serious doubt whether an individual's travel with intent to do something inimical to the interests of the community, but without any step other than the individual travel being taken to effect the intent, could be made an offense." *United States v. Dellinger*, 472 F.2d 340, 358 (7th Cir. 1972), cert. den. 1973.

97. As Justice Jackson has written, "Crime, as a compound concept, generally constituted only from the concurrence of an evil-meaning mind and an evil-doing hand, was congenial to an intense individualism and took deep and early root in American soil." *Morissette v. United States*, 342 U.S. 246, 251-252, 72 S.Ct. 240 (1952).

98. The Supreme Court has analogously stated, "We hold here that in our jurisprudence there is...no doctrine of 'anticipatory perjury.' In the criminal law, both a culpable mens rea and a criminal actus reus are generally required for an offense to occur. Similarly, a future intention to commit perjury or to make false statements" is not a sufficient basis to invoke the Fifth Amendment. *United States v. Apfelbaum*, 445 U.S. 115, 131, 100 S.Ct. 948 (1980). In the middle of the

foregoing quote the Supreme Court included a footnote that stated, "Fn.13. As recognized by one commentator, Shakespeare's lines here express sound legal doctrine:

His acts did not o'ertake his bad intent;
And must be buried but as an intent
That perish'd by the way: thoughts are no subjects,
Intents but merely thoughts.
Measure for Measure, Act V, Scene 1
G. Williams, Criminal Law, The General Part 1 (2d ed. 1961)."

99. More broadly, in a case involving the discharge of a United States Navy midshipman for publicly acknowledging his homosexuality, Judge Patricia Wald in a dissenting opinion discussed several settings in which the imposition of criminal sanctions was not countenanced for thoughts not accompanied by clear criminal conduct. Judge Wald first noted that in the prior restraint context, "if prior conduct does not permit an inference regarding future conduct, such a conclusion is still less justifiable when based on mere orientation of 'desire.' '[A] person's inclinations and fantasies...are his own and beyond the reach of government...'" *Steffan v. Perry*, 41 F.3d 677, 714 (D.C. Cir. 1994)(internal citations omitted).

100. Judge Wald then pointed out that the Constitution "expressly repudiates constructive treason....The restrictions imposed by our Constitution, limiting the definition of treason to particular conduct and requiring an 'overt act' for conviction, expresses the fundamental constitutional principal that a person's thoughts are his own – however distasteful they may be to the state or to the

populace." *Steffan v. Perry*, 41 F.3d at 713-714.

101. Finally, Judge Wald observed that "even the Cold War fears of internal subversion could not induce the Supreme Court to countenance...an inference of future misconduct on the basis of an admission of inchoate 'desire'...such an inference is repugnant to time-honored legal principals that guard the sanctity a person's 'thoughts and desires' against governmental control." This followed an analysis of a series of Smith Act cases, in which "the Supreme Court construed the subversive advocacy provisions of the Act to require both specific conspiratorial intent to overthrow the government at some future date, and active advocacy of (as opposed to a mere statement of support for) that position." *Steffan v. Perry*, 41 F.3d at 714.

102. The danger of convicting an innocent defendant for the type of offense charged in this case has been explicitly recognized in prosecutions for violation of the closely related statute, 18 U.S.C. §2422(b). That statute criminalizes attempting to persuade a minor to engage in criminal sexual activity. Cases brought under §2422(b) typically involve Internet communication with an undercover police officer, followed by travel to a staged meeting. Several courts of appeals have held that "the defendant's objective acts, without reliance on the accompanying mens rea, must mark the defendant's conduct as criminal...Thus, the defendant's acts, taken as a whole, must strongly corroborate the required culpability; they must not be equivocal." In a footnote that court explained, "Fn.

58

12. The purpose...is to avoid 'the conviction of persons engaged in innocent acts on the basis of mens rea proved through speculative inferences, unreliable forms of testimony, and past criminal conduct.' *Oviedo*, 525 F.2d at 885; see also, *United States v. York*, 578 F.2d 1036, 1038 (5thCir. 1978)(noting that courts have often sought to distinguish between 'preparation for a crime, which is not criminal, and an attempt, which has ripened into an offense')"; and *United States v. Root*, 296 F.3d 1222, 1228 (11th Cir. 2002). The *Root* court, in addition to citing *Oviedo* (525 F.2d 881, 5th Cir. 1976) and *York*, both supra, also relied on *United States v. Carothers*, 121 F.2d 659 (11th Cir. 1997) and *United States v. McDowell*, 705 F.2d 426 (11th Cir. 1983).

103. Similarly, in *United States v. Powell*, 1 F.Supp.2d 1419, 1422 (N.D. Ala. 1998), the court concluded: "the government must prove its case by showing that Powell's 'objective acts,' irrespective of the true identities of [the two undercover officers], sufficiently corroborate the firmness of Powell's alleged criminal intent," adding in footnote 6, 'Powell would have a strong basis for appealing a conviction if the government only presented evidence of his criminal intent but no objective conduct which strongly and unequivocally corroborates the firmness of his criminal intent.'

104. In this case, Mr. Cote engaged in communication with an undercover officer in an adult fantasy Internet chat room in which establishment of a relationship was discussed and a meeting arranged; he traveled in interstate commerce; and

59

he met another adult undercover officer and was arrested. In this sequence of events there is not the corroboration of the defendant's intent that the §2422(b) cases require.

105. The Defendant submits that such corroboration is required. Otherwise there is too great a chance that an innocent defendant will be convicted. There is also too great a chance that constitutionally protected chat room activity will be impermissibly infringed upon.

106. The Seventh Circuit has interpreted 18 U.S.C. §2333 in a similar manner to avoid First Amendment infirmity. The Court held that when tort liability is imposed for conduct that "occurs in the context of a constitutionally protected activity, precision of regulation is required...When activity protected by the First Amendment is present damages are restricted to the direct consequences of the illegal violent conduct and may not include consequences resulting from associated peaceful picketing or other protected First Amendment activity." *Boim v. Quranic Literacy Institute, et al.*, 291 F.3d 1000, 1023 (7th Cir. 2002).

107. A similar constitutional requirement has been imposed for prosecutions under 18 U.S.C. §875, for transmitting communications containing any threat to kidnap or injure the person of another. Prosecutions under that statute have been constrained by First Amendment considerations to require what is called a "true threat," which requirement is "consistent with a rational approach to First Amendment construction which provides for governmental authority in instances

60

of inchoate conduct, where communication has become 'so interlocked with violent conduct as to constitute for all practical purposes part of the (proscribed) action itself.'"*United States v. Kelner*, 534 F.2d 1020 (2nd Cir.), cert. den. 429 U.S. 1022 (1976). Accord, *United States v. Baker*, 890 F.Supp. 1375, 1382 (E.D. Mich. 1995). 108. Consonant with the foregoing cases, in enforcing §2423(b) criminal intent must be established wholly separate and apart from constitutionally protected chat room communications and constitutionally protected travel. There must be objective corroboration of the defendant's intent, beyond the mere communication between the defendant and the officer. Otherwise there is too great a prospect of violation of constitutional rights and too great a possibility of the conviction of an innocent defendant. This will be easier for the government to achieve where the defendant has a history of pedophilia or there has been a real minor contacted by the defendant. However, in this case such corroboration is wholly lacking. Consequently, the indictment is legally inform and therefore must be dismissed with prejudice.

### REMEDY FOR VIOLATION OF RIGHTS UNDER FIRST AMENDMENT, FREEDOM OF INTIMATE ASSOCIATION, FREEDOM OF TRAVEL, AND PRIVACY

109. The government may not enforce §2423(b) unconstitutionally. An arrest and prosecution may not be brought by a manner and means that violates a defendant's rights under the First and Fourteenth Amendments and the rights of privacy and interstate travel. Mr. Cote was lawfully in an adult Internet chat room.

The interaction of government agents with Mr. Cote in this chat room then led to Mr. Cote's travel based upon the chat room speech, which resulted in his arrest. Prior to his arrest Mr. Cote engaged in no other conduct that was itself illegal or corroborative of any unlawful intent on his part. The chat room was invaded by a government agent who had no knowledge that anything illegal was transpiring in that particular chat room, on the part of Mr. Cote or anyone else. This governmental intrusion was a part of an active and growing practice of law enforcement to enter and deceptively interact with people on the Internet, at a time when the Internet is becoming an increasingly important arena for the social, cultural, and political life of our society. Law enforcement does so in the guise of protecting children, notwithstanding the fact that the officers have no prior knowledge that anything untoward is occurring in many of the locations into which they enter, including the adult fantasy chat room of Mr. Cote. Nor does there appear to be a government enforcement strategy effectively designed to address the solicitation of minors on the Internet while intruding as little as possible on constitutionally protected rights, as required by the law. Instead, we have a bull in a china shop.

111. As the Supreme Court has stated of the Internet, "This dynamic, multifaceted category of communication includes not only traditional print and news services, but also audio, video, and still images, as well as interactive, real- time dialogue. Through the use of chat rooms, any person with a phone line can become a town

62

crier with a voice that resonates further than it could from any soapbox...As the district court found, 'the content on the Internet are as diverse as human thought.'...we agree with its conclusion that our cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 870, 117 S.Ct. 2329 (1997). The same level of scrutiny applies to all of the fundamental constructional rights implicated in this case.

112. It is set forth earlier in this memorandum how and why Mr. Cote's speech in the adult fantasy chat room is protected speech under the First and Fourteenth Amendments. With respect to such speech, the Supreme Court has further stated, "The government...may regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest. We have recognized that there is a compelling interest in protecting the physical and psychological well-being of minors....The Government may serve this legitimate interest, but to withstand constitutional scrutiny, 'it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms'...It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends." *Sable Communications of California v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829 (1989). In this case it is not evident that the government has engaged in any tailoring at all in designing and implementing

its investigative and prosecutorial strategy, despite the constitutionally protected environment in which this investigation was conducted and from which the prosecution emanated.

113. There is no evidence that the government has engaged in a meaningful assessment of the problem of child abuse, in general; of the problem of sexual abuse, more particularly; or of the specific problem of Internet sex solicitation of minors, and then developed and implemented a law enforcement strategy to address the problem, but without unwarrantedly interfering with constitutionally protected rights. This case involved the Cook County Sheriff's Police Department initiating an investigation, and calling in the F.B.I. prior to Mr. Cote's arrest, which resulted in the prosecution by the U.S. Attorney's Office. Quite apart from each law enforcement agency's independent obligation to adhere to the Constitution, there exists a ready vehicle for the government to coordinate law enforcement strategy among the Cook County Sheriff, the F.B.I., and the U.S. Attorney. On the U.S. Attorney's Office web site is a prominently heralded pair of programs denominated "LECC/ATTF," standing for the Law Enforcement Coordinating Committee (LECC) and the Anti Terrorism Task Force. The goal of the LECC is stated as being "to improve cooperation and coordination among law enforcement groups, thereby enhancing the effectiveness of the criminal justice system. The LECC program has become a cornerstone of joint federal, state and local law enforcement efforts." See, http://www.usdoj.gov/usao/iln/leccattf/index.html.

114. The study from the Journal of Adolescent Health shows that information on which to base a rational enforcement strategy exists. Yet there appears to be little interest in law enforcement to pursue enforcement "carefully tailored" to the requirements of the Constitution, to use the Supreme Court's phraseology. Moreover, this case was initiated by the Cook County Sheriff. Yet the chat room involved is an international one, and an Illinois officer going into such a chat room without prior cause is an even less narrowly tailored means of preventing child solicitation in Illinois.

115. Instead, a practice of arresting first and letting the defendant prove his innocence appears to prevail. But the Supreme Court has said of this approach, in the context of child pornography, "The government may not suppress lawful speech as a means of to suppress unlawful speech....The Government raises serious constitutional difficulties by seeking to impose on the defendant the burden of proving his speech is not unlawful. An affirmative defense applies only after prosecution has begun, and the speaker himself must prove, on pain of a felony conviction, that his conduct falls within the affirmative defense....If the evidentiary issue is a serious problem for the Government, as it asserts, it will be at least as difficult for the innocent" defendant. *Ashcroft v. The Free Speech Coalition*, 535 U.S. 234,255, 122 S.Ct. 1389 (2002).

116. No doubt, individual officers and their superiors favor the present approach. It generates arrests and convictions, and results in favorable publicity, which, in

65

turn, aids in the eternal quest for more budget authority and authorized positions. But it runs afoul the constitution, and it is not at all clear that it is anywhere near as effective in addressing the real problem of sexual solicitation of minors as a more carefully developed approach would be. Such a program would focus on chat rooms where real teenagers are found and would check out the criminal background of targets before going beyond initial encounters (in the chat room in this case typing in the command "whois?" in the command line, after highlighting Mr. Cote's name in the chat room screen, would have gotten you his correct e-mail address. From there law enforcement could readily have identified him and run an NCIC check.) But it is not for the defendant to tell law enforcement how to devise their strategy. Nor is the defendant asking the Court to micro-manage law enforcement policy. Rather, defendant Cote submits that law enforcement has simply not tried to proceed in conformity with the constitution.

117. As a result, the investigation and prosecution of this case have resulted in the violation of Mr. Cote's rights under the First Amendment, the Fourteenth Amendment, and his rights to privacy and to travel. The government investigation in this case was not narrowly tailored nor did it employ the least restrictive means available. The government simply does not have a compelling interest in entering an adult chat room where obvious fantasy chat is taking place and trying to set up Mr. Cote, who has no prior criminal record, no history of child solicitation, and whose prior assignations arranged on the Internet have all been with adult women.

66

Any objection that law enforcement cannot have known all of the foregoing is wrong. Before law enforcement seriously infringes on constitutionally protected rights, it should have to take reasonable steps to establish that a compelling governmental interest is present, e.g., that child sex solicitation is actually, or at least probably, taking place. The mere possibility that such activity was occurring is not sufficient, particularly in an adult chat room that is explicitly for fantasy chat. Not only does fantasy chat invoke certain constitutional protections, but the fact that fantasy chat is what is transpiring negates the reasonableness of any law enforcement suspicion that unlawful conduct is occurring or that minors are likely to be present.

117. With neither a proper venue or a proper target, law enforcement should have ceased and desisted from pursing Mr. Cote's case. Just entering this chat room was of questionable constitutional permissibility, but continuing to pursue and target Mr. Cote in the absence of any objective corroboration that he was engaging in anything other than adult fantasy chat renders the institution of this case constitutionally flawed and its continuation further constitutes a violation of Mr. Cote's constitutional rights. The specter of such intrusive activity by government agents will have precisely the type of chilling effect on prospective participants in the chat room that the First and Fourteenth Amendments bar, and enforcement of the statute in this manner renders it unconstitutionally vague.

118. As discussed above, the government is on a veritable crusade against the

67

solicitation of children on the Internet. Setting aside the question of the extent to which the protection of children is the primary responsibility of parents (see, "As a judge...I must confess to a growing sense of unease when the interest in protecting children from prurient materials is invoked as a justification for using criminal regulation of speech as a substitute for, or a simple backup to, adult oversight of children's viewing habits." *Ashcroft v. ACLU, supra, 124* S.Ct. at 2797, J. Stevens, concurring), and no matter how laudable the law enforcement goal, the government simply must adhere to constitutional limitations.

120. It is particularly important for the courts to be vigilant in this newly emerging Internet arena in which millions of Americans are now regularly participating. Not only are constitutional values at stake, but defendants are being arrested and prosecuted solely for their perceived intentions, rather than for their actions that have caused actual harm.

121. Defendant Cote therefore asks this court to find that the indictment in this case constitutes an unconstitutional application of §2423(b) under the First and Fourteenth amendments and the rights of travel and privacy.

122. The Defendant has sought to present a reasonable full picture of the aspects of this case that pertain to this motion to dismiss. However, to the extent that the Court determines that the facts need to be developed more fully or that there are conflicts in the facts appropriate for the Court to resolve in order to determine this motion, then the Defendant asks this Court to hold a hearing on the motion.

WHEREFORE, defendant Cote moves this Court to dismiss the indictment in this case, or, in the alternative, to hold a hearing on this motion.

Respectfully submitted,

Attorney for Defendant

John M. Beal
Attorney at Law
53 W Jackson Blvd., Suite 1108
Chicago, IL 60604
(312) 408-2766

69