## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES,<br><br>v.<br><br>FRANCOIS COTE, | No. 03 CR 271<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

### I. Background

On January 27, 2003, the Defendant, Francois Cote, entered an Internet chat room named #O!!!!!!!!!!younggirlsex[1] under the nickname Tenderkni, a shortened form of his screen name Tenderknight. Also in the chat room was Cook County Sheriff's detective Mary Perovich, who was acting in an undercover capacity posing as a 14 year old girl. Detective Perovich was using the screen name Lil Mary ("Mary").

Shortly after entering the chat room, Cote initiated a private "chat" with Mary. During their chat, Mary indicated that she was "14 f chgo" and that she liked older men. Noting this initial interest, Cote asked "have you had sex?" to which Mary replied "not yet." Cote then stated that he was "very excited that you are 14 years old and a virgin." When Mary replied "really," Cote responded, "it's very exciting to be your first... to hear you and see you as you receive so much pleasure for the first time." Cote further inquired as to whether that would "appeal" to Mary and whether she "might be interested in meeting in person?" to which Mary replied "yeah - pics arent always who u r."

---

[1] #O!!!!!!!!!!younggirlsex is described as a "Fantasy channel for young girls and those who love then [sic]." (Def. Ex. 3).

Later in the chat, Cote asked Mary what she "imagine[d]" about "making love to an older man" and said that he would "love to visit [her]" and "get a hotel room." Cote then reiterated that he would like to "be [her] first." Cote and Mary went on to discuss how he could arrange a visit, including how he would rent a hotel room and how Mary would have to keep her mother from finding out about the meeting. Cote acknowledged that spending the night with Mary would be "a little risky" but insisted that "it's worth trying."

Over the next two weeks, Cote expressed his desire to travel to Chicago and meet Mary in person, indicating that "[he'd] been looking at plane schedules and hotels online" and that he was trying to arrange the visit on Valentine's Day. During subsequent chats and phone conversations, Cote and Mary discussed Mary's school schedule to determine times when she would be alone. During this time, Cote expressed his fear of being caught with Mary and of going to jail if Mary's mother found out about them.

Ultimately, Cote was unable to make the Valentine's Day trip to Chicago. In a series of chats and emails, Cote rescheduled the trip for March 12, 2003. He arranged to meet Mary on that day at a Wendy's restaurant near, but not too near, her school at lunch time. In a March 11th email, he stated "I'm a little concerned, because I'll be picking you up at lunchtime, and for all we know, your next door neighbor could be there getting lunch. However, it's a 10 block walk from your school... I realize all these precautions may seem paranoid, but unfortunately the risk is great." In other emails sent the same day, Cote gave Mary his flight information and told her to sit and wait for him at the Wendy's.

Cote arrived in Chicago on a Continental flight originating out of Newark around noon on March 12, 2003. He reserved a room at the Hampton Inn near the airport and called for a taxi

2

to take him to the Wendy's where he and Mary had arranged to meet. Once in the taxi, Cote told the driver he needed to pick his daughter up at the Wendy's and take her back to the airport. Cote entered the restaurant at approximately 1:00pm and approached undercover deputy Russ who was posing as Mary. Cote asked Russ if she was Mary; Russ replied that she was, and Cote greeted her with a hug. Unfortunately for Cote, Russ's greeting wasn't nearly so warm. Cote was immediately taken into custody by FBI agents and Cook County Sheriff's deputies. After the arrest, the agents seized Cote's cellular telephone and accessed information contained in its electronic call log and phone book. Cote was taken directly to a Cook County police station where he was questioned from 1:30pm to 7:45pm and where he was held overnight. While Cote admits that he signed a written *Miranda* waiver at approximately 5:30pm that evening, he claims that he was not given a *Miranda* warning at the time of his arrest. The arresting agents claim, however, that Cote was advised of his *Miranda* rights immediately after his arrest. (See Gov. Ex. 3).

During his interview, Cote admitted that he had traveled from Newark, New Jersey to Chicago and that he took a taxi to the Wendy's to meet Mary. Cote also admitted that he had met Mary in a chat room and that Mary had represented herself as a fifteen year-old girl. Cote denied soliciting sex from a minor and stated instead that he was acting out a sexual fantasy with a woman he believed was an adult pretending to be a minor. He also stated he was surprised at how young Mary looked when he met her at the restaurant and claimed that he would not have had sex with Mary if he truly believed she was a minor.

At some point during the interview, Cote provided written and oral consent to search his email accounts, chat room accounts, computer, and the room in which his computer was located.

3

On the following day, March 13, 2003, FBI agents went to Cote's residence and seized his computer. In the meantime, Cote met with his first lawyer who withdrew all consent to search the computer. Before consent was withdrawn, the Cook County Sheriff's deputies conducted a partial, on-line search of Cote's email and chat room accounts using a password he had voluntarily provided. That partial search revealed, among other things, the email and chat room communications Cote had had with Mary between January 28 and March 11, 2003. Ultimately, a search warrant was issued for Cote's computer, but the search revealed nothing beyond what had already been found.

## II. Cote's Motion to Dismiss the Indictment

The single count indictment in this case charges Cote with traveling in interstate commerce for the purpose of engaging in a sexual act with a minor, in violation of 18 U.S.C. § 2423(b). Cote now moves to dismiss the indictment on the grounds that § 2423(b) is unconstitutional.

### A. The First Amendment

First, Cote argues that the agent's intrusion into an adult fantasy chat room violated his rights under the First Amendment. Cotes claims he and the other chat room participants were engaged in expressive speech and were entitled to constitutional protection. Speech concerning adult sexual fantasy, so long is it is not obscene, is protected by the First Amendment. *See Reno v. ACLU,* 521 U.S. 844 (1997); *Sable Communications of California, Inc. v. FCC,* 492 U.S. 115 (1989). However, Cote's First Amendment claim fall short because § 2423(b) does not attempt to regulate the content of that protected speech. Section 2423(b) makes it a crime for any person to "travel in interstate commerce...for the purpose of engaging in any sexual act with a minor."

4

18 U.S.C. § 2423(b). There is nothing in the wording of the statute to suggest that it attempts to limit speech. Instead, § 2423(b) "criminalizes conduct which incidentally involves speech." *United States v. Kufrovich,* 997 F. Supp. 246, 254 (D. Conn. 1997). Specifically, it criminalizes travel with the intent to engage in a sexual act with a minor – the planning of which may have involved speech. Because there is no attempt to directly regulate the content of speech between chat room participants, it does not contravene the underlying principle of free speech: that the government should not be able to discourage the expression of unpopular or controversial views. *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 49 (1986).[2]

Despite the lack of content-based regulation in the statute, Cote argues that its enforcement will have a chilling effect on speech. Specifically, he claims that the presence of undercover officers, such as Mary Perovich, impermissibly burden speech in adult chat rooms. I disagree. If Cote had limited his interactions with Mary to the chat room, his so called adult sexual fantasy would not have fallen within the purview of § 2423(b). It was not until Cote traveled to Chicago that his conduct became potentially criminal and his knowing interaction

---

[2] As a subset of his First Amendment argument, Cote claims that § 2423(b) is overbroad because it intrudes into protected conversations occurring in adult chat rooms. "[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep." *Chicago v. Morales,* 527 U.S. 41, 52 (1999). The overbreadth doctrine is "strong medicine" that a court should employ "only as a last resort." *Broadrick v. Oklahoma,* 413 U.S. 601, 610 (1973). The overbreadth must be substantial before a court can invalidate the statute on its face. *New York v. Ferber,* 458 U.S. 747, 769 (1982).
    The wording of the statute directs law enforcement to pursue only those persons who undertake the specific action of traveling across state lines with a demonstrated intent to engage in a sexual act with a minor. As one might guess and/or hope, this is a narrow group of individuals. Contrary to Cote's assertions, the statute does not criminalize erotic speech taking place in an adult fantasy chat room. Thus, I also find that § 2423(b) is not overbroad.

with the criminal justice system began.[3]  Since § 2423(b) does not attempt to limit or criticize speech within the chat room, I find that it does not impermissibly burden speech.

   **B. Vagueness**

   Second, Cote argues that § 2423(b) is impermissibly vague.  A criminal statute may be void for vagueness if it fails to provide "the kind of notice that will enable ordinary people to understand what conduct it prohibits" or if "it may authorize and even encourage arbitrary and discriminatory enforcement."  *Chicago v. Morales,* 527 U.S. 41, 56 (1999).  Section 2423(b) provides:

> A person who travels in interstate commerce, or conspires to do so... for the purpose of engaging in any sexual act (as defined in section 2246) with a person under 18 years of age... shall be fined under this title, imprisoned not more than 15 years, or both.

As is obvious from its wording, the statute prohibits any person from traveling from one state to another in order to engage in sexual acts with a minor.  A person of ordinary intelligence could easily glean this meaning from the wording of the statute.  Thus, Cote should have understood that meeting Mary, a purported minor, for the purpose of engaging in a sexual act was a crime.  Furthermore, its application is limited to those persons who travel across state lines.  For these reasons, I find the statute is not impermissibly vague.

   I am unpersuaded by Cote's argument that the statute is vague because it does not differentiate between those persons who believe that the other party is a minor and those who do

---

   [3] Law enforcement agents in this case were involved in an undercover investigation.  Like Mary Perovich, most agents acting in an undercover capacity pursuant to § 2423(b) are trying to and do appear to be "average" participants in the chat room.  The only time a chat room participant will become aware of an agent's true identity is after the relationship between the agent and the participant has left the chat room.  Thus, those chat room participants whose interactions are limited to the virtual world are not likely to be affected by an agent's presence.

not. The statute clearly provides that an intent to engage in a sexual act with a minor is a required element of the offense. If it was not Cote's intent to engage in a sexual act with a minor, he may raise that as a proper defense. But, it is irrelevant to a determination of vagueness.

**C. Freedom of Association & Right to Privacy**

Third, Cote argues that the enforcement of § 2423(b) violated his right of intimate association under the Fourteenth Amendment. The right to intimate association "receives protection as a fundamental element of personal liberty." *Roberts v. United States Jaycees,* 468 U.S. 609, 618 (1984). The kinds of personal associations entitled to constitutional protection are characterized by "relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.* at 620. While the precise boundaries of the intimate association right are unclear, constitutional protection is not limited to familial relationships. *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 545 (1987). Instead, the Constitution "protects those relationships... that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'" *Id. (quoting Roberts,* 468 U.S. at 619-20).

So, the first question I must address is whether Cote's association with Mary and other chat room participants warrants constitutional protection. Certain parts of Cote's chat room relationships clearly fall outside the protected realm. Those include any associations that were limited to chance encounters in the chat room. *See Dallas v. Stanglin*, 490 U.S. 19, 24 (1989). The relationships forged in the open and somewhat anonymous chat room lack the kind of

7

seclusion and exclusivity required to trigger constitutional protection. While it is true that the members of this particular chat room are discussing topics of a personal nature, the subject matter of their chats alone does not draw an otherwise unprotected association into the protected realm.

Other parts of Cote's association, which began in the chat room but also extended into private chats, phone conversations, and an in-person encounter, are not so easily set aside. Cote claims that he used the chat room to meet other consenting adults interested in acting out the sexual fantasy of "young girl meets older man." As we have seen from the evidence presented in this case, acting out this fantasy took considerable planning and involved private discussions, taking place over the span of a month and a half. It also involved at least one in-person meeting. Had Mary been an adult participating in the sexual fantasy, as Cote claims he believed, and had the agents not intervened, the relationship could have extended to further meetings and communications. Thus, for the purposes of this analysis, it must be assumed that his relationship with Mary was the equivalent of an early-stage dating relationship.

In the somewhat inconsistent case law on intimate association in non-marital relationships, most courts lean toward extending some level of constitutional protections to co-habitating couples. See *Kukla v. Antioch,* 647 F. Supp. 799, 808 (N.D. Ill. 1986) (choice to live with one's significant other falls within the personal intimacies of the home and should be given intermediate scrutiny); *Kraft v. Jacka,* 872 F.2d 862, 872 (9th Cir. 1989) ("the relationship between [the parties] as cohabitating, single adults may fit into our description of an intimate protected association"); *Marcum v. Catron,* 70 F. Supp. 2d 728 (E.D. Ky. 1999) (relationship of the cohabitating plaintiff may be constitutionally protected); *Briggs v. North Muskegon Police*

8

*Dep't,* 563 F. Supp. 585, 590 (W.D. Mich. 1983) (the "associational interests" of the plaintiff and the woman he was living with were "sufficiently fundamental to warrant scrutiny of the defendants' acts on more than a minimal rationality basis").

Courts have also been willing to extend similar constitutional protections to dating relationships. In *Wilson v. Taylor,* 733 F.2d 1539, 1544 (11th Cir. 1984), the Eleventh Circuit held that the "state violates the fourteenth amendment when it seeks to interfere with the social relationship of two or more people." *See also Manlove v. Town of Hymera,* No. 01 C 0171, 2002 U.S. Dist. LEXIS 14722 at *10 (S.D. Ind. Jun. 18, 2002) ("a dating or relationship choice might be considered 'one of the vital personal rights essential to the orderly pursuit of happiness by free men'") (*quoting Loving v. Virginia,* 388 U.S. 1, 12 (1967)). However, exactly when a dating encounter advances into protected territory is somewhat unclear. In *Dallas v. Stanglin*, 490 U.S. 19, 24 (1989), the Supreme Court found that "dance-hall patrons, who may number 1,000 on any given night, are not engaged in the sort of 'intimate human relationships' referred to in *Roberts*." *Stanglin*, 490 U.S. at 24 (*quoting Roberts,* 468 U.S. at 617-18). In reliance on *Stanglin,* the Seventh Circuit declined to extend intimate association protection to an encounter between an off-duty officer and a young woman, which consisted of a thirty-minute ride on the officer's motorcycle. *Swank v. Smart,* 898 F.2d 1247, 1251 (7th Cir. 1990). *See also IDK, Inc. v. County of Clark*, 836 F.2d 1185, 1193 (9th Cir. 1988) (a "relationship between escort and client possesses few, if any, of the aspects of an intimate association").

At best, Cote's relationship with Mary falls somewhere between the chance meeting in a dance hall considered in *Stanglin* and the more established dating relationships considered in *Wilson* and *Manlove*. While it likely was Cote's intent to enter into a relationship that would be

9

secluded from others with a person in whom he could confide his private thoughts and experiences, it was probably not Cote's intent to enter into a relationship involving a high level of attachment and commitment. In terms of his relationship with Mary, Cote himself has claimed to be a man with one foot in fantasy and the other in reality. At some point, the fantasy would have played itself out, and Mary would have lost her allure. Because this relationship appears to lack the kind of potential for commitment discussed in *Roberts*, I am not inclined to classify it as an intimate association in the constitutional sense.[4]

That being said, even assuming Cote's relationship with Mary was entitled to constitutional protection, his claim would still fail. I agree with the court in *Kukla* that non-familial decisions concerning "cohabitation and sexual choice fall in the category of rights given intermediate scrutiny." 647 F. Supp at 808; *see also Briggs*, 563 F. Supp. at 590. The statute at issue here, § 2423(b), makes it illegal to travel in interstate commerce for the purpose of engaging in a sexual act with a minor. This prohibited conduct is most certainly reasonably related to the government's legitimate interest in protecting minors.[5] For all of these reasons, I find that Cote's rights of intimate association and privacy were not violated.

**D. Right to Travel**

Finally, Cote argues that § 2423(b) impermissibly burdens his fundamental right to interstate travel, in violation of the Fifth and Fourteenth Amendments. While the right to travel

---

[4] Although, I do not rule out the possibility of such a finding. To make a definitive finding on the nature of Cote's relationship with Mary, I would have to delve more deeply (and more formally) into the facts of this case.

[5] I would also find that this statute could survive strict scrutiny; the government has a legitimate and compelling interest in protecting minors and the statute is narrowly tailored to further that interest in that it prohibits only the act of traveling in interstate commerce so as to engage in a sexual act with a minor.

interstate is well established, one does not have a fundamental right to travel for illicit purposes. *United States v. Bredimus,* 352 F.3d 200, 210 (5th Cir. 2003); *United States v. Brockdorff,* 992 F. Supp. 22, 25 (D.D.C. 1997); *See Also Shapiro v. Thompson,* 394 U.S. 618, 634 (1969). Since the statute at issue here criminalizes only interstate travel when it is done with the illicit intent of engaging in a sexual act with a minor, I find that it does not impermissibly burden Cote's right to travel.

**III. Cote's Motion to Suppress His Statements of March 12 & 13, 2003**

Cote challenges the admissibility of his March 12th and 13th post-arrest statements. Cote alleges that he was not advised of his *Miranda* rights until approximately 5:30pm on March 12th, nearly four and a half hours after he was first arrested. Cote claims that both his pre- and post-*Miranda* statements should be suppressed. In response, the government alleges that Cote was properly warned upon his arrest at 1:00pm, making all interviews taken on March 12th and 13th admissible. The dispute over the timing of the *Miranda* warning must be resolved by a hearing before I can properly consider the admissibility of the statements.

Cote also challenges the admissibility of his statements on the grounds that they were a direct result of an unlawful arrest. The arrest, according to Cote, was unlawful because it was made without probable cause. However, in light of the substantial evidence showing that Cote intended to engage in a sexual act with Mary, a self-purported minor, the agents and officers had sufficient probable cause to arrest Cote. Over a six-week period, Cote had multiple discussions with Mary concerning his desire to meet her for the purpose of engaging in a sexual relationship. Specifically, Cote stated that it was "very exciting to be her first" and that he would "love to visit [her]" and "get a hotel room." Cote took substantial steps in order to effectuate this meeting – he took a flight to Chicago, rented a hotel room, arrived at the prearranged meeting place, and

11

approached and hugged the woman he believed was Mary. Since the arrest was proper, there is no need to suppress Cote's post-arrest statements on those grounds.

**III. Cote's Motion to Suppress All Evidence Retrieved From His Cellular Phone**

Subsequent to Cote's arrest, the FBI seized his cellular phone and accessed the phone's call log, phone book, and wireless web inbox. Cote claims the search of his cell phone was improper because it was done without his consent and without a warrant. Cote overlooks the fact that search and seizure of his cellular phone was made incident to a valid arrest. Searches of items such as wallets and address books, which I consider analogous to Cote's cellular phone since they would contain similar information, have long been held valid when made incident to an arrest. *United States v. Rodriguez,* 995 F.2d 776 (7th Cir. 1993) (*citing United States v. Molinaro,* 877 F.2d 1341, 1346-47 (7th Cir. 1989)). Thus, the officers had no need to obtain either Cote's consent or a warrant before searching his cellular phone.

Additionally, the fact that the contents of the phone may not have been searched at the scene of the arrest does not make it improper. It appears, from the FBI's 302 report, the phone was searched two and a half hours after the arrest was made and Cote was taken to a Cook County police station. This short lapse in time "is not sufficient to invalidate the search... because 'searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention.'" *Rodriguez,* 995 F.2d at 778 (*quoting United States v. Edwards,* 415 U.S. 800, 803 (1974)). Since Cote's phone was searched soon after he arrived at the police station, the search of the phone was permissible as a search incident to arrest. For these reasons, Cote's Motion to Suppress the evidence obtained from his cellular phone is denied.

Cote's Motion to Dismiss the Indictment is DENIED.  Cote's Motion to Suppress is DENIED.  Cote's Second Motion to Suppress is ENTERED and CONTINUED until a hearing to determine whether Cote was advised of his *Miranda* prior to 5:30pm on March 12, 2003.

ENTER:

*James B. Zagel*
_____

James B. Zagel
United States District Judge

DATE: May 26, 2005